Robert E. JURGENSEN, Appellee,

v.

FAIRFAX COUNTY, VIRGINIA; Carroll D. Buracker, Chief; Kelly Coffelt, Major, Appellants,

and

Fairfax County Police Department, Defendant.

Robert E. JURGENSEN, Appellant,

v.

FAIRFAX COUNTY, VIRGINIA; Carroll D. Buracker, Chief; Kelly Coffelt, Major, Appellees,

and

Fairfax County Police Department, Defendant.

Robert E. JURGENSEN, Appellee,

v.

FAIRFAX COUNTY, VIRGINIA; Carroll D. Buracker, Chief; Kelly Coffelt, Major, Appellants,

and

Fairfax County Police Department, Defendant.

Nos. 82–2153 (L), 83–1500 and 83–1646.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 8, 1983.

Decided Oct. 4, 1984.

Rehearing and Rehearing In Banc Denied Nov. 2, 1984.

Robert M. Ross, Asst. County Atty., Fairfax, Va. (David T. Stitt, County Atty., Fairfax, Va., Robert Lyndon Howell, Sr. Asst. County Atty., Alexandria, Va., on brief), for appellants/cross-appellees.

Victor M. Glasberg, Alexandria, Va., for appellee/cross-appellant.

Before RUSSELL and ERVIN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

DONALD RUSSELL, Circuit Judge:

This is a § 1983, 42 U.S.C. action, brought by an employee of the Fairfax County (Virginia) Police Department, seeking injunctive and declaratory relief as well as damages and restoration of position. The defendants are the County of Fairfax, its Police Department, and two of its ranking police officers. According to his complaint, the plaintiff Jurgensen had been demoted in rank by the defendants "in reprisal of ... [his] whistle-blowing" consisting of "provid[ing] the [Washington] Post with a copy of the [audit] Report" of the defendants on the internal operations of the Police Department's Emergency Operations Center (EOC).[1] The defendants by

---

1. Congress enacted as a part of the Civil Service Reform Act of 1978 a provision giving federal employees certain protection "for the lawful disclosure of information which the employees reasonably believe evidences (A) a violation of any law, rule, or regulation, or (B) mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." 5 U.S.C. § 2301(b)(9). The statute, however, provides a procedure un-

their answer set up various defenses, the main defenses being absence of any free speech violation and the rendering of the controversy moot by the plaintiff's acceptance of the demotion. The defendants moved for summary judgment but the district court denied such motion. The cause then proceeded to trial before a jury. The jury returned a verdict for the plaintiff and judgment followed. The defendants have appealed that judgment and we reverse.

The plaintiff Jurgensen had been employed in the EOC since 1974 and was an Assistant Squad Supervisor at the time the events giving rise to this suit occurred. He admittedly had been a good employee as his promotion to an Assistant Squad Supervisor attested. The EOC has three major functions, according to a departmental report: "telephone answering, radio dispatching and computer transactions" as well as responsibility "for monitoring bank alarms, handling tele-serve complaints, answering the crime solver telephone, and overseeing wrecker service." Since it represents "the location of all police and fire/rescue communications for the County [it] . . . must be manned and operated 24 hours a day." It has some sixty-odd employees and is housed in the building where the general police activities are located. The employees are divided into squads working on what was known as the 4–10 schedule. The plaintiff was in charge of one such squad.

In 1980 the Department commissioned the preparation of an internal review of the operation of EOC. Two high-ranking officers of the Department were assigned to conduct the review and to report such recommendations as they thought appropriate to the proper officers of the Department. The review was completed and the recommendations were filed in early fall or late summer of 1980. The inspection report followed the pattern of a normal administrative operational review. It included nothing sensational. It found no illegal action; it identified no abuse of authority or power; it referred to no evidence of corruption or waste; it pointed to no discrimination among employees. In short, it was simply an internal administrative review report. It did make a number of recommendations, primarily of the "housekeeping" variety. It found, for instance, that there had been a substantial increase in the workload of the Center between the years 1979 and 1980 without any increase in staff. It recommended an increase in staff, something that was done before the report was purloined by Jurgensen for the benefit of the reporters, as we indicate later. This problem was somewhat accentuated, it found, because there had been a change to a four-day, 10 hour work shift in the Center. It said that "[a]lthough to an individual everyone [in the Center] interviewed liked the 4–10 shift schedule for the day-off benefits, everyone admitted the schedule made working more stressful . . . [and] that as a result of the 4–10 schedule EOC was not able to provide as good a service as in the past." As a result of these two factors, i.e., the understaffing and the 4–10 schedule, "a working environment [was created] that at times is nearly intolerable from both a personal and an

der which the right may be asserted in proceedings before the Merit Systems Protection Board but it confers no right of private action by the employee. *See Borrell v. U.S. Intern. Communications Agency,* 682 F.2d 981, 987 (D.C.Cir.1982); *Cazalas v. United States Dept. of Justice,* 569 F.Supp. 213, 227–29 (E.D.La.1983). The Merit Systems Protection Board to which enforcement of this whistleblower statute is committed, has expressly limited the right to cases which meet the "but for" requirement of *Mt. Healthy,* [429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471] to which we refer later, in order to comply with the legislative purpose and not permit the statute to

be used to thwart disciplinary action for violation of valid employment regulations, such specifically as insubordination. In enacting this statute, "Congress apparently wanted not only to provide an effective and expeditious process for investigating whistleblower allegations, but also to protect against abuse of that process to halt termination based on unsatisfactory job performance." *Borrell,* 682 F.2d at 988.

Virginia has not enacted a similar statute giving specific protection to the "whistleblower." Since the employee in this case is employed by a Virginia public subdivision, the federal statute has no application.

agency perspective." [2] The report's recommendation in this regard was:

"An immediate increase in experienced personnel or a return to a three or four squad schedule are the only ways EOC can return to a staffing level that is adequate."

The report made a number of other suggestions: it found that the training of new personnel should be modified. "Formal EOC training for new employees begins only after several persons have been hired." Such practice means that, in some instances, a new employee's formal training could be delayed for several weeks. The report suggests that formal training be given when a new employee is employed. The report, also, took note of the needs of the Center in connection with equipment. It spoke favorably of the need for more telephone lines in the Center. It found that "down-time" for the computer operation was such that, though "not critical to the operational function of the Department," it was "critical administratively to those affected by the inconvenience it causes." It recommended that if it should develop that the "down-time" adversely affects the district stations' ability to retrieve cases, a program change could help resolve the problem. It found that in the case of "routine" (as distinguished from critical) calls, carelessness in response had occurred in a few instances as a result of inadequate coordination during shift changes. It felt the Center should have an auxiliary power system in order to cope with that rare situation when there might be a "power blackout." A number of equipment replacements was suggested. As is obvious from this review, the inspection report was unquestionably a typical report, with a minimum of critical comment and a complete absence, as we have said, of a charge of corruption, abuse of process or power, waste or mismanagement.

After filing of the report, the Department created a special group to review and implement the report. On October 17, 1980 Major Coffelt, the commander of the Department's Technical Services Bureau and the head of the group to which had been assigned, so far as practicable, the implementation of the recommendations of the review, prepared an initial "EOC Status Report" on behalf of the group for his superiors. In this update Major Coffelt commented by way of an introduction that the purpose of these updates was to provide the superiors in the Department with "periodic update[s] . . . to keep [such officials] abreast of current events and future

---

**2.** This "4–10 schedule" of a work week, or, as it is often described, "the compressed work week," is an innovative move to achieve a greater concentration of amount of "time off" in a week, affording the employee more recreation time, and contributing to increased productivity. It has been extensively discussed in management journals and has been widely adopted in the United States and Canada. See *New Patterns for Working Time,* Monthly Labor Review (U.S. Dept. of Labor February 1973); Golembiewski & Proehl, *A Survey of the Empirical Literature on Flexible Work Hours: Character and Consequences of a Major Innovation,* Academy of Management Review, October 1978; Ronen & Primps, *The Compressed Work Week as Organizational Change: Behavioral and Attitudinal Outcomes,* 6 Academy of Management Review 61 (1981). The innovation is described in Ronen & Primps thus:

"The compressed work week (CWW) is an alternative work schedule in which a trade is made between the number of hours worked per day, and the number of days worked per week, in order to work the standard number of weekly hours in less than 5 days. However, beyond the designation of the total number of hours worked per week, and the number of days in which the employee reports to work, there can be many variations in scheduling. The most common compressed schedule is a 10-hour day, 4-day week, often designated as the 4/40....

"For the employee, the CWW offers the potential for better utilization of leisure time for recreation, personal business, and family life. On the job, the compressed week extends the work day, and may reduce the total work force reporting on a given day if the firm remains open for business 5 days a week." We have included a description of this innovation because it and the lack of adequate employees are the two main complaints of Jurgensen. As the above literature makes clear, the "4–10 schedule" is a new idea in employment management. While its use may be criticized by Jurgensen and some other employees, it is a well-recognized and accepted management tool which is said to give benefits to the employee and the employer.

plans dealing with the upgrading of EOC." He then proceeded in this early report to list various steps already taken in response to the recommendations of the review. These were: Priorities in implementing the various recommendations of the review had been established; the Director of Communications had been instructed to explore the procedure for acquiring additional frequencies for the use of EOC; a requisition had been initiated for a new conveyor belt; a supplemental appropriation of $60,000 had been obtained "to replace the Mobile Center" in the EOC unit; a Training Task Force had been constituted for the purpose of providing improved training services in the unit; a request for five additional positions in the unit had been requested for the next fiscal year; plans were being developed for an emergency generator for use "in the event of a commercial power loss;" "shift configurations" were being studied "as a means of providing manpower consistent with workload requirements" in effecting a change from the 4–10 schedule; and a number of other minor matters were slated for improvement.

The record in the case from this point on includes the "periodic updat[ings]" of the implementation program of the report's recommendations by the assigned unit of the department under Major Coffelt. In keeping with this procedure, Major Coffelt on December 11, 1980, submitted on behalf of his group another "Status Report." In this report he referred to the establishment of "a shift configuration in E.O.C. which will provide the best level of service." This development represented one of the important recommendations in the review. He wrote, also, that the "Training Task Force" was "nearing completion of the curriculum for new employees" in the unit, that progress was being made with "the emergency generator in E.O.C.," that the specifications for the mobile command center

bus had been prepared and the purchasing unit of the Department was proceeding with the bidding procedures, that "all call-out numbers, procedural manuals, and files [had] been updated" and that "[o]ther items listed in [his] original report" are proceeding with some delays resulting from the inability of other agencies to provide necessary services. On March 10, 1981, the installation of the new training program "based in part upon a staff inspection report and a special E.O.C. Training Task Force" was reported. In his next April 21, 1981, "Status Report," Major Coffelt referred to the successful installation of the new training program and reported (1) the acquisition of the "new command bus" and (2) progress in developing "911" service in the EOC unit, but expressed disappointment at the temporary disapproval of the request for new positions in fiscal year 1982. He concluded with this comment:

"Overall, I feel EOC is performing adequately. However, as previously indicated, the staffing continues to be a problem which needs consideration. It is my opinion that additional staff is needed due to the increased workload being experienced as well as the anticipated workload which will be generated with the implementation of '911.'"

In a later report, it was stated that six additional positions had been added to relieve any overload.[3]

The Deputy Chief of Police on April 29, 1981, responded to Major Coffelt's April report by writing Major Coffelt, that "there are a number of issues [relating to the EOC Inspection] which still need resolution." In an attachment, he listed the various items in the inspection report and then asterisked those he thought "still needed resolution." On May 19 and 22, 1981, Major Coffelt responded to the Deputy Chief's letter, giving detailed informa-

---

**3.** It is reasonable to assume that Jurgensen knew of these status reports and made at least some of them available to the reporters before they wrote their story about the inspection report. This conclusion is sustained by the fact that in the story in the *Post* about the inspection

report, it refers to one of the status items (a report of Colonel King of the department) and actually quotes from it. Apparently, Jurgensen made available to the reporters not merely the inspection report but internal memoranda covering the implementation of the report.

tion about each problem asterisked by the Deputy Chief. In June 1981 the County Executive furnished the Board of Supervisors of the County a full report, six pages in length, which detailed each problem identified in the EOC inspection report and the steps already taken or in progress to deal with the recommendation.[4] There can be little doubt from this record that the Department had in June 1981 undertaken an aggressive program for dealing with the problems identified by the inspection report.

Sometime in April or May 1981 a reporter of the *Washington Post* called the Center late one evening. He was seeking news. He talked to Jurgensen. The telephone conversation between the reporter and Jurgensen developed into a discussion of general conditions in the Department. Their discussion centered on "an article that had appeared in the *Post* a few days before ... concerning [comparative] per capita expenditures for police department operations [which] article addressed the very low figure for per capita expenditures in the budget for the Fairfax County police." In order to prolong the discussion, a meeting between Jurgensen and a reporter for the *Post* at a private restaurant was agreed upon.

At this later private meeting Jurgensen told the reporter of the problems in the EOC as he saw them.[5] In the course of such discussion, he apparently referred to the internal report prepared by direction of the Department, including many of the specific items in that report. Alerted by Jurgensen to the existence of the report, the reporter promptly visited the Department and interviewed Deputy Chief Buracker. The reporter queried Buracker about certain problems in the EOC and requested an opportunity to read the inspection report. While responding freely to the reporter's specific questions about the Department and particularly about conditions in the EOC, Chief Buracker refused to give the report to the reporter, saying it was a confidential internal review. Chief Buracker did give—and this is an important fact— the reporter free access to inspect the EOC and its operations, as well as the right to speak freely to the employees working there. On the basis of this permission, the reporter conducted an inspection of the EOC and talked to some of the sixty people working in the Department about working conditions in the unit. The reporter experienced no difficulty in talking to the employees in the unit nor does it appear that the employees were in any way discouraged from expressing their opinions, some of which were critical, about the operations of the unit. No employee was in any way criticized for such expression.

The *Post* reporter was not satisfied with his personal inspection of the unit or with the conversations he had had with employees. He continued to talk to Jurgensen and, in particular, requested Jurgensen to secure for him an actual copy of the inspec-

---

**4.** One of the items in this report which went directly to the problem that seemed to be one of Jurgensen's primary causes of dissatisfaction, was:

"The police department has been authorized to dual encumber nine ECA positions. The dual encumbering should offset the understaffing that results from personnel turnover. Additionally, four officers have been temporarily assigned to EOC to help cover the increased workload. Following the implementation of 911, staffing requirements will be reassessed and addressed. Additional positions for EOC will be a part of the FY1983 police department budget request."

**5.** The problems the plaintiff saw in the EOC were later described by him at trial in these words:

"I felt that the people were overworked and underpaid and on my squad the people were not allowed to eat a meal in peace after working a 10-hour shift. They worked ten solid hours and weren't allowed breaks when other county employees were having breaks, ... in the morning and afternoon and the people working for me, the only time they could take a break was when they ran upstairs for a moment and they would have to drink their coffee and run back downstairs because their place was being filled by co-workers, and they couldn't be gone for any length of time." As is seen, his objections related largely to the 4–10 work schedule, to which Major Coffelt in his updates, had referred and which is discussed in footnote 2.

tion report. According to Jurgensen, the reporter was persistent in these requests in the course of a number of meetings and telephone calls. He told Jurgensen that he had asked Chief Buracker for the report but Chief Buracker had refused to give it to him. Jurgensen finally without authorization took clandestinely a copy of the inspection report from the files of the Department and at a private conference with the reporter, allowed the reporter to read the report with the express understanding that the reporter would not quote verbatim from the report. This arrangement was unsatisfactory to the reporter. He wanted the report itself in hand in order to satisfy his editors of the correctness of his quotations therefrom.[6] Jurgensen was reluctant to accede to this latter request because, as he explained it, he knew such requests, under department regulations had to go "through channels." Finally, Jurgensen, with reluctance, gave the report to the *Post* reporter to use as he chose.[7] Jurgensen explained in the course of the later internal affairs investigation of the incident the circumstances which lead him to release the report at the time:

"I released it to Bob Woodward of the *Washington Post* through Ron White because he questioned repeatedly about conditions that existed within the center and I had no reasonable intention of releasing this report; and after many phone calls and conversations with Bob [Woodward] I gave him a copy of this report."

In another statement made by Jurgensen to Colonel King, which he did not deny, he further explained his action in releasing the report, saying "that he [referring to Colonel King] did not understand what it was like being pressured by someone like Bob Woodward to release the information."[8] It is thus obvious from the plaintiff's own testimony that he took the report from the files of the Department and gave it to the reporter, even though the reporter told him [Jurgensen] that the Department had refused to release the report, not because he thought the report to be a public document which he could release but because of the "pressure" applied "by someone like Bob Woodward." Perhaps, as the dissent states, "[n]o police official or supervisor told Jurgensen that it [the report] was confidential" but he knew, because the *Post* reporter told him, that the Department regarded it as confidential.

With the report in hand, the *Post* reporter prepared his article which was published on June 26, 1981. This article was relatively innocuous as indicated at the outset by its headline: "Fairfax's Troubled Number—Emergency Call Staff is Plagued by Low Morale, Rapid Turnover" and by the fact that there was no follow-up. The first two paragraphs of the article stated that an "internal police department review last summer" had shown that the EOC was "understaffed" and its employees "overworked." It reproduced the language in certain internal departmental memos (apparently furnished the reporter by Jurgensen) of Colonel King about the " 'constant turnover' rate and poorly trained personnel" in the EOC, as well as certain language taken directly from the inspection report itself. In order to show that the language had been taken directly from the

6. The *Post* reporter later explained his insistence on securing a copy of the report. That insistence was not because the reporter did not already have all the information about the report which he needed for his story. Jurgensen had given him that information. The *Post* had, however, run a story based on information allegedly procured by one of the paper's reporters, from an individual. After the story won a Pulitzer prize, it developed that the reporter had fabricated the whole story and the person she was purporting to quote did not exist. Therefore, the reporter said he wanted the report itself so he could verify that the "quotations were cor-

rect." The reporter accompanied this request with a threat and a promise: Without the report the paper would not run a story on the unit but if the plaintiff would get the report for him, the *Post* would publicize the report and the EOC problems.

7. Jurgensen later referred to this action as a "judgment error" on his part.

8. Mr. Woodward was at the time the news editor for the *Post*. He had acquired quite a reputation as an investigative reporter during the Watergate investigation.

reports of the inspection group or Colonel King, the reporter put such language in quotation marks. The *Post* article referred also to interviews with "[s]ome of the 60 employees at the center"—identifying at least one of them with whom the reporter had talked by name—who had said "morale [was] poor" and that the findings in the review "remain accurate." Some comment was made in the article about long working hours resulting from the 4–10 work schedule. A comparison was also given in the response time for calls to the Center (13.3 minutes) as compared with those to a similar unit in Montgomery County (11.5 minutes). The article concluded with the statement that the Center's "authorized strength [would] go from 60 to 69 [employees] in two weeks" and that additional personnel would be requested at the budget hearing in August. This one article was the only one published in the *Post* on the EOC.

This summarization of the newspaper story demonstrates that it included no suggestion of corruption, nepotism, violation of law, or even inattention on the part of the defendants to the problems of the EOC. The complaint of employees detailed in the article related to understaffing, overlong working hours, inadequate training of personnel, and low pay. None of these claims—claims that are common among employees—is indicative of any illegal or improper conduct on the part of the defendants. Much of the material in the article covered information not in the inspection report. Moreover, such problems of the Center as were identified in the report had been addressed by defendants prior to the *Post* publicity, except the claim of low pay (which was not even adverted to in the inspection report), as even the article indicated; and it is apparent from the story that the reporter had access to information to this effect, as shown by his quotation from Colonel King's memorandum. Moreover, the fact that the *Post* ran only this one short article on a back page of the paper on the report on conditions in the

unit is important. If the report had revealed serious charges of misconduct, corruption or mismanagement, which would, in the opinion of the *Post* editors, have been of serious public interest to anyone other than Jurgensen and some of his fellow employees, there would undoubtedly have been follow-up stories. Apparently, the editor published the initial article, hidden as it was inside the paper, simply because the reporter and Mr. Woodward had promised Jurgensen that, if he would procure a copy of the report for them, they would run a story on it.

After the newspaper article was published with a number of direct quotations from the internal inspection report, the Department began an inquiry into the identity of the employee who had removed the report from the Department and given it to the *Post* reporter. In the course of such inquiry, Jurgensen was interviewed on July 16, 1981. He admitted in that interview giving the report to the *Post* reporter. On the day following his admission of responsibility for taking the report from the Department's files and giving it to the *Post* reporter, Jurgensen on his own initiative visited Major Coffelt and inquired what disciplinary recommendation he (Major Coffelt) expected to make on the basis of his (Jurgensen's) admissions the day before of his violation of the departmental rules. Jurgensen accordingly recognized that he had violated departmental rules and was concerned to know what disciplinary action was to be taken because of his admitted violation. Major Coffelt told him, according to his testimony, that he (Coffelt) was considering recommending either a demotion to communications assistant and a transfer, or at most, he would recommend termination.[9] At this point, Jurgensen said he "wanted to see the Chief." Just before Coffelt and Jurgensen left Coffelt's office, Jurgensen asked Coffelt, "[w]ell, if you decide to fire me, would you then let me resign so I can get another job somewhere else?" Coffelt suggested that any re-

---

**9.** Major Coffelt testified that he told Jurgensen that that was his tentative recommendation, but he had not formulated his final recommendation.

sponse to that question be delayed until after the interview with the Chief. Coffelt made the arrangement to see the Chief and in a few minutes Jurgensen and Coffelt went to the Chief's office.

After they reached the Chief's office, Coffelt recited the facts of the investigation as they related to Jurgensen since the Chief at that time had not received any report on the matter or any recommendation for disciplinary action against Jurgensen. Jurgensen did not take exception to either the fairness or the accuracy of Coffelt's account. There is a difference in the testimony of Jurgensen and Chief Buracker from this point on.[10] The Chief, according to Jurgensen's testimony, expressed the opinion, on the basis of the facts given him, that Jurgensen's taking of the report from the Department's files and giving it to the *Post* reporter was "gross misconduct," and all the more serious because Jurgensen as a supervisor was "held to a higher standard" than an ordinary employee. Buracker, on the other hand, testified that he told Jurgensen that he was "not prepared to hear this case." He added that Jurgensen responded by requesting that his case not be heard but that he would like for the Chief "to consider a voluntary demotion."[11] Jurgensen's testimony, on the other hand, was that although Chief Buracker stated he was "not a vindictive man" he inquired whether he (Jurgensen) would take "a voluntary demotion." Irrespective of whether Jurgensen or the Chief first suggested a demotion as an appropriate disposition of the matter, Jurgensen agreed in writing to the dropping of the charges and to a voluntary demotion.

**10.** Subsequent to the filing of the inspection report, Buracker had been promoted to Chief.

**11.** Jurgensen's reason for not wishing his case heard was that, if he lost, he feared it would be difficult for him to obtain another job.

**12.** The defendants did not strictly demote Jurgensen nor was there ever a formal recommendation "through channels" that he be demoted. As we have already stated, Jurgensen visited Major Coffelt while the latter was considering the recommendation he would make for disciplining Jurgensen for releasing without authori-

Jurgensen explained at trial his reasons for agreeing to a demotion:

"Like I started to say, I was having problems, domestic problems at the time and severe financial problems and I just couldn't risk losing my job. If I lost my job, I felt that I would lose everything."

Later, he added:

"There was a threat there for dismissal staring me in the face and I felt a tremendous amount of pressure put on me and I felt like I had to make a decision right then and there."

He also justified his acceptance of the voluntary demotion rather than pursuing his rights under the Civil Service procedure:

"I couldn't take the chance of losing my financial income, I just couldn't take that risk."

Several days after the written agreement between Chief Buracker and Jurgensen, the latter wrote a letter to the Chief "requesting a recission of the volunary demotion" because he had executed it "in a situation of duress," and asking that ordinary disciplinary proceedings be instituted against him, so that if he were dismissed, he could "then take the normal course of channels to Civil Service and the judicial remedy, if necessary." The request was denied. Since that time he has continued in the employ of the Department but at a different police station and in a lower-rank. Eleven months after his demotion, Jurgensen filed this action.

The plaintiff's basic cause of action is one to recover for a violation of his free speech rights resulting in his demotion as a public employee.[12] In order to establish a

ty the inspection report. Major Coffelt had not prepared and never prepared a formal recommendation. Under plaintiff's own version, he interviewed the Chief before the matter of discipline for Jurgensen had ever been received by him (Buracker). Jurgensen, of course, was anticipating that he would be subjected to some form of discipline. He claimed to be taken aback by the severity of the discipline suggested by Major Coffelt. He testified he expected only a few days being charged against him for his violation of the Department rules. But his demotion was not actually ordered by the defend-

cause of action by a public employee for an alleged wrongful discharge or demotion in violation of the employee's First Amendment rights, the plaintiff-employee must demonstrate (1) that the speech complained of qualified as protected speech or activity and (2) that such protected speech or activity was the "motivating" or "but for" cause for his discharge or demotion. That this is the appropriate formula to be applied in determining liability in such a case was authoritatively settled by *Mt. Healthy City School Bd. of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), in which the Supreme Court said that a public employee asserting a violation of his right of free speech in connection with his discharge or demotion has the burden of "show[ing] that his conduct was constitutionally protected, and that this conduct was a 'substantial factor'—or, to put it in other words, that it was a 'motivating factor' in the [employer's] decision not to rehire [or to discharge or to demote] him." [13] This test was later refined in *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 417, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979), as a "but for" standard. And the resolution of these two critical issues is a matter of law and not of fact. *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 1690, n. 7, 75 L.Ed.2d 708 (1983); *Jones v. Dodson*, 727 F.2d 1329, 1334 (4th Cir.1984). It follows, as the above rule indicates, that the first question to be resolved by the Court in a case such as this is whether the speech or conduct involved was constitutionally protected, for, as was said in *Foster v. Ripley*, 645 F.2d 1142, 1148 (D.C.Cir.1981), "to demonstrate a violation of First Amendment rights, a government employee allegedly discharged as a result of certain speech or activity must first demonstrate that the conduct was constitutionally protected." If the speech or activity in question cannot be "fairly characterized as constituting speech [or activity] on a matter of public concern, it is unnecessary ... to scrutinize the reasons for [an employee's] discharge [or demotion]." *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. at 1690.

■ In resolving the first question whether the material distributed qualified as free speech, we begin by observing that the First Amendment guarantee of free speech is not absolute, *Breard v. Alexandria*, 341 U.S. 622, 642, 71 S.Ct. 920, 932, 95 L.Ed. 1233 (1951) and this is particularly so in the case of public employees, since "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general," *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Because of this significant difference in the position of the public employer, the Supreme Court in *Pickering* established a test to be applied in order to determine whether a public employee's speech or activity qualified for constitutional protection. Under this test, the question is to be settled by striking "a balance between the interests of the [public employee], as a citizen, in commenting upon matters of

---

ants; it was the result of an agreement between Jurgensen and the Department, which agreement he later charged was procured by duress. We have, however, accepted the plaintiff's characterization of his voluntary action as a demotion.

**13.** One commentator has read *M.. Healthy* as "in effect" the adoption of "the district court's 'substantial factor' rule as a threshold test, to be followed by a 'but for' causation analysis." Note, *The Nonpartisan Freedom of Expression of Public Employees*, 76 Mich.L.Rev. 365, 377 (1977). Another commentator has concluded that "in *Mt. Healthy* the Court devised a 'harmless error' standard to test whether a public

employee has been wrongfully discharged for engaging in otherwise protected first amendment activity." Note, *Constitutional Law-Supreme Court Restricts First Amendment Rights of Public Employees,—Connick v. Myers*, 58 Tul.L. Rev. 831, 835 (1984).

In Vaughn, *Civil Service Discipline and Application of the Civil Service Reform Act of 1978*, 1982 Utah L.Rev. 339, 361, the author states the rule of *Mt. Healthy* thus:

"Even if an employee shows that a disclosure is protected, he still must demonstrate that the disciplinary action was taken in retaliation for the protected disclosure."

public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*, at 568, 88 S.Ct. at 1734–35. In the application of this test, as it has been recently defined in *Connick v. Myers*, it is not necessary for the agency to prove that morale and efficiency in the agency have actually been adversely affected by the publication; it is sufficient that such damage to morale and efficiency is reasonably to be apprehended. If the perception of potential harm or damage is present, that fact may outweigh any First Amendment rights involved. 103 S.Ct. 1693–94; Connolly, *Connick v. Myers; Restricted Freedom of Speech for Public Employees*, 30 Fed.Bar News & Journal 390, 391 (1983).[14] In fact, the decision in *Connick* has been construed by one Commentator as having "alter[ed] the balancing test [of *Pickering* ] to the extent that the government's interest in efficiency of operations is now favored over the first amendment rights of public employees in three ways. First, constitutional protection is now extended to fewer subjects. Second, speech dealing only partially with matters of public concern is afforded only limited protection. Third, evidence that speech was actually disruptive is not required to justify an employee's dismissal." Note, *Public Employees and the First Amendment: Connick v. Myers*, 15 Loy.U.L.J. 293, 305 (1984). In the Article, *Developments in the Law: Public Employment*, 97 Harv.L.R. 1611, 1761 (1984), the author also recognized that *Connick* had narrowed the public employee's free speech rights: "Last term, in *Connick v. Myers*, a bare majority of the Supreme Court voted to establish two new guidelines [in this area], both of which favor the employer." As will be seen, this *Pickering-Connick* test of whether the speech or activity qualifies for First Amendment protection, consists of two parts, one part of which is directed at the question whether the employee's speech or activity qualifies as "a matter of public concern" and the other focuses upon the effect of such speech or activity on the efficiency, discipline and proper administration of the agency.[15]

■ One of the significant factors to be initially considered in deciding whether the "speech" relates to "a matter of public concern" is the subject-matter of the speech or action. If the speech relates primarily to a matter of "limited public interest" and does not "seek to bring to light actual or potential wrongdoing or breach of public trust," centering instead on matters primarily, if not exclusively "of personal interest" to the employee such as employee grievances over internal working conditions, etc., that fact must be weighed in determining whether a matter of true public concern is involved for the "First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 103 S.Ct. at 1691. Where personal or employee grievances are more the subject-matter of the speech than matters of public interest it is the rule that "a wide degree of deference to the employer's judgment is appropriate." Id. 103 S.Ct. at 1692.[16] In fact, it has been said that "under *Connick*, employment issues are not of

**14.** *See also, Borsari v. F.A.A.*, 699 F.2d 106, 112 (2d Cir.1983):
"In addition, the explicit language of 5 U.S.C. § 2302(b)(10) permits employers to punish misconduct which will have an adverse effect on the 'performance of others.'"

**15.** A Commentator has suggested that under *Connick* the speech is to be "considered twice, first in determining the threshold issue of whether the speech is a matter of public concern, and again in determining whether there was detrimental impact on efficiency of the

public service under the *Pickering* test." Note, *Connick v. Myers: Narrowing the Free Speech Right of Public Employees*, 33 Cath.U.L.Rev. 429, 448 (1984).

**16.** This language of *Connick* has been taken by one commentator as a substantial narrowing of the "'conception of what subjects are of public concern.'" Note, *Constitutional Law—Supreme Court Restricts First Amendment Rights of Public Employees—Connick v. Myers*, 58 Tul.L.Rev. 831, 840 (1984).

public concern ...." [17] Similarly, the judgment of the employer is generally to be deferred to where, even if there is a public concern, there is such concern "in only 'a most limited sense.' " [18] It, therefore, is important to analyze carefully the exact language in order to determine whether it qualifies as a matter of "public interest" beyond "a most limited sense." [19]

■ In considering the second part of the *Pickering-Connick* test, courts must give weight to the nature of the employee's job in assessing the possible effect of his action on employee morale, discipline or efficiency. In so doing, it must be recognized that such effect may vary with the job occupied by the employee. In analyzing the weight to be given a particular job in this connection "nonpolicymaking employees can be arrayed on a spectrum, from university professors at one end to policemen at the other. State inhibition of academic freedom is strongly disfavored. *See Wieman v. Updegraff,* 344 U.S. 183, 195, 73 S.Ct. 215, 220, 97 L.Ed. 216 (1952) (Frankfurter, J., concurring). In polar contrast is the discipline demanded of, and freedom correspondingly denied to policemen. *See e.g., Gasparinetti v. Kerr,* 568 F.2d 311, 321 (3d Cir.1977) (Rosenn, J., dissenting in part), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978) ("police forces are a para-military force"); *Kannisto v. City and County of San Francisco,* 541 F.2d 841, 843 (9th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977) (emphasizing police department's interest in " 'discipline, *esprit de corps,* and uniformity' "). Note, *Free Speech and Impermissible Motive in the Dismissal of Public Employees,* 89 Yale L.J. 376, 381, n. 43 (1979).

Viewing thus the employee's status, the courts, under the second part of the *Pickering-Connick* test, must accord what the Supreme Court in *Connick* characterized as "full consideration of the government's interest ... 'in promot[ing] efficiency and integrity in the discharge of official duties, and [in] maintain[ing] proper discipline in the public service.' " 103 S.Ct. at 1692. In fact, one of the errors for which the Supreme Court in *Connick* chided the lower court in that case was that "full consideration" of those interests had not been given. In a case such as this, involving as it does employment in a police department, it is important, as has already been suggested, to take account of the special character of such department in determining the matter of "the government's interest." Police departments "[r]egardless of the historical origin," are "para-military organizations" and the free speech rights of employees in those departments must thus be evaluated with the special character of the organization in mind. While manifestly, under such a rule, the free speech rights of an employee in a police department are more limited than of a teacher, this is not to say that such employees have no free speech rights. It does mean, though, that the character of such an employee's employment is an "element in the balance of interests in his or her individual case," to be considered in determining the agency's interest in regulating his speech. *See* Finch, *Nonpartisan Speech in the Police Department: The Aftermath of Pickering,* 7 Hastings Const. L.Q. 1001, 1012–14 (1980), with a full discussion of the point, and *Muller v. Conlisk,* 429 F.2d 901–04 (7th Cir.1970).

But, as we have already observed, it is not sufficient under *Mt. Healthy* that the speech or activity involved qualifies as within First Amendment protection under the *Pickering-Connick* test; a valid cause of action under that Amendment requires that the exercise of that right of protected speech or activity was the "but for" cause of the employee's discharge or demotion. The resolution of such fact, as well as that of whether the speech or activity is of

---

17. The Supreme Court, 1982 Term, 97 Harv.L. Rev. at 168 (1983).

18. Note, *Public Employment,* 97 Harv.L.Rev., 1611, 1761 (1983).

19. It was for this reason that we detailed so fully the inspection report and its implementation.

"public concern" depends on the identification of what was the cause of the employee's discharge or demotion. The exercise by the employee of his right of free speech must be, as we have said, the "but for" cause of his discharge or demotion and, unless it can be said that it was the "but for" cause, the action must be dismissed. It thus becomes essential to determine at the outset the actual cause of the plaintiff's challenged demotion. That question fortunately is easily answered in this case.

All the parties, as well as the district judge, were agreed on the specific activity or speech that caused Jurgensen's demotion. There is no question about the defendants' position on this point: they contended consistently that the conduct of the plaintiff which caused the plaintiff's demotion was his removal of the internal inspection report from the departmental files and his release of that report *"despite contrary [departmental] regulations"* to the *Washington Post* reporter (Italics added). The district judge also recognized this to be the defendants' position. Thus, when the plaintiff's counsel sought to prove the plaintiff's employment record at trial, the district judge ruled such evidence was irrelevant because, as he said, "that is not the issue here. They're not saying this was because of poor work. They're saying it is because of the release [of the inspection report]." The plaintiff demonstrated at trial that he agreed with this ruling. Plaintiff's counsel in offering plaintiff's work record, explained his reason for proffering such evidence: "[t]he reason I offered this, there wasn't any complaint until release of the report and I would submit it [*i.e.,* his record of promotions and work evaluations] in aid of that." The district judge subsequently in reaffirming his ruling that the cause for the plaintiff's threat of disciplining was solely the release of the report, told counsel for the plaintiff:

"If there are some other factors or disagreements for the actions they took [*i.e.,* than the release of the report] I'll let you put him back on, but that doesn't appear to be the case here."

There was never any attempt to recall the witness or any argument raised by the plaintiff that there was any other reason for his alleged demotion than the release of the report. Finally, in his order granting the plaintiff's attorney attorney's fees the district judge said: "Mr. Jurgensen made the document [report] public despite contrary police [department] regulations. As a result, he faced possible suspension and eventual demotion and transfer." Thus, it is manifest the district court found that the plaintiff's "possible demotion" was the "result" of releasing "the document ... despite [or in violation of departmental] regulations." And this was the basis of the district judge's submission of the cause to the jury as evidenced by his instruction to the jury:

"You must weigh the plaintiff's First Amendment right to distribute the EOC report, a public document, in the manner in which he chose against the defendants' reasonable right to regulate his First Amendment right to promulgate an ordinance to promote the efficiency of the police department." [20]

Since, as we have seen, it was agreed that the cause of plaintiff's demotion was his release of the departmental inspection report in violation of departmental regulations, the first issue in the case to be resolved relates not to the report itself or to its contents but to whether its release was in violation of a *valid* regulation governing plaintiff's employment. This is so because a demotion of an employee resulting from a violation of a valid regulation governing his employment would not satis-

---

**20.** It will be noted that the district judge submitted to the jury the resolution of the *Pickering* balancing test in this case. This is contrary to both *Connick* and *Dodson.* If this were a case in which that issue were determinative, the proper course would seem to be a remand to the district court to apply the *Pickering* test to the facts of this case. Compare, however, *Connick.* Since we are of the opinion that this case should be decided under the "but for" test of *Mt. Healthy,* it is unnecessary to remand the cause in order for the district court to apply the *Pickering* balancing test.

fy the second requirement of *Mt. Healthy,* that the exercise by the employee of his right of free speech was the "but for" cause of his demotion. A demotion because of a violation by an employee in releasing a report in the files of the employer would be insubordination and, as such, would justify demotion, irrespective of whether the report released involved some matter of "public interest" or not. This is the teaching of *Connick.* In that case the plaintiff had distributed a questionnaire among the employees in the district attorney's office. Such questionnaire presented, in part, a matter of "public interest." Despite this, the Supreme Court sustained the plaintiff's discharge, because her action was one of insubordination.[21] Equally in point are decisions of the Merit Systems Protection Board under § 2302(b)(8), of which *Special Counsel v. Department of State,* 9 MSPB 14 (1982) is illustrative.

In *Special Counsel* the federal employee had been terminated "on the basis of charges of removal of government files from NYPA (New York Passport Office) [in violation of regulations] and insubordination." The employee, in resisting removal, asserted his rights under 5 U.S.C. § 2302(b)(8) as a "whistleblower," who had sought by his removal of the files to publicize mismanagement in the office. Section 2302(b)(8) provides basically that an employee may not be terminated or subjected to adverse personnel action "as a reprisal for—

(A) a disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences—

(i) a violation of any law, rule, or regulation, of

(ii) mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, ...."

The Board determined, on the basis of *Mt. Healthy* that "Congress intended the Board to order corrective action under 5 U.S.C. § 2306(c)(1)(B) only when the prohibited personnel action is the 'motivating' or the 'real reason' for the agency action" and further that the Act "should not be construed as protecting an employee who is otherwise engaged in misconduct or who is incompetent, from appropriate disciplinary action."[22] The Board concluded that while the employee's termination may have been "motivated in part by Mr. Rohrmann's protected whistleblowing," such "whistleblowing" was not the "motivating factor" or "real reason" for the agency's action but that his "insubordination" and "misconduct"—insubordination in doing exactly what Jurgensen did in this case—were the motivating factors. The termination was upheld as one based on insubordination.[23]

---

**21.** It has been suggested that "insubordination" by an employee will never constitute a basis for invoking the *Mt. Healthy* rule where there is a claim of a free speech violation. However, *Connick* is exactly such a case where the Supreme Court held that the distribution by the employee Myers of the questionnaire "was an act of insubordination which interfered with working relations .... Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." 461 U.S. at 151–52, 103 S.Ct. at 1692, 75 L.Ed.2d at 723. It accordingly found that the discharge of Myers for insubordination was proper. *See also Special Counsel,* 9 MSPB 14 (1982). *See,* construction of *Connick* in Note, The Supreme Court, 1982 Term 70, 166 (1982) ("... that Myers' questionnaire was an act of insubordination ....")

**22.** It is important to note that Congress granted rights to the "whistleblower" but committed the enforcement of such statute to the Merit Systems Protection Board, which in repeated decisions such as *Special Counsel,* has enforced the *Mt. Healthy* "but for" rule and has consistently held in cases such as this that the employee has no defense under the statute against disciplinary action. In this case there is no "whistleblower" statute since a state employee is involved and, without the benefit of such a "whistleblower" statute, the employee here assuredly *cannot* have greater rights than those given federal employees under the "whistleblower" statute.

**23.** *See also, Abbott v. Thetford,* 534 F.2d 1101 (5th Cir. en banc 1976); *Smith v. United States,* 502 F.2d 512 (5th Cir.1974); *Caffas v. Bd. of Sch. Dirs. of Upper Dauphin Area,* 23 Pa. Cmwlth. 578, 353 A.2d 898 (1976).

An interesting case relevant here is described in an editorial in The New York Times, titled

There can be no dispute that the action of the plaintiff in releasing the report to the *Post* reporter violated a departmental regulation governing the release of such reports by employees in the department. General Order No. 401 of the employee regulations of the defendant Department provides:

"Authority to release official department information of any type shall be limited to the Chief of Police, Deputy Chief of Police, Commander of the Staff Services Division and the Public Information Officer (hereinafter referred to as information releasing authorities) or individuals specifically designated by them, except as expressly provided elsewhere in this order. Except as noted, no employee shall release any official information to a representative of the news media without specific prior authorization from one of the foregoing information releasing authorities." [24]

Further, Section 204.4 of the regulations is to the effect:

"Employees shall not reveal police information except as provided elsewhere in this manual ...."

All employees of the Department were required to obey "all rules and regulations of the department" and were required to "maintain a working knowledge of all ... regulations and general orders of the department." In the event of a violation of such rules or regulations the regulations state that, "it will be presumed that the [party charged] was familiar with the law, regulation or order in question."

These regulations and rules are not obscure nor are they vague or overbroad. They are stated in plain and understandable language. Moreover, not only was the plaintiff "presumed" to have knowledge of these plain and understandable regulations but he was sufficiently familiar with the regulations to know that his action in releasing the report was in violation thereof. He testified that he was "broadly familiar with the regulations of the Department [relating to release of certain documents, which he correctly identified as General Order No. 401] ...." He further admitted at trial that he "knew the method [provided in General Order No. 401 for release of departmental reports] and [he] acknowledged that ... [only] certain persons [were] authorized to release" documents or reports in the possession of the Department. Moreover, he was alerted by the *Post* reporter that the Department considered the report as confidential and not releaseable. We are accordingly dealing with a knowing violation by an employee of a regulation imposed on him as a condition of his employment.

This knowing violation of the above regulations on the part of the plaintiff in taking surreptitiously and without authority from the Department files the internal inspection report and giving it to the *Post* reporter was insubordination—more so than the ac-

"The Clients are Dead," April 28, 1984, p. 18. The facts of such case as stated in the editorial were that Irwin Levin, a supervisor in the municipal office of Special Services for Children, removed certain files from the office which he said demonstrated " 'gross errors' " in processing certain reports of child abuse. He took these files to the press. He was demoted as a result. As the editorial commented, the demotion in that case was sustained because "his [Levin's] demotion was not retaliation for whistleblowing but for unlawful acts" in removing the files and giving them to the press and others.

This is just such a case as that described in the above editorial. The plaintiff's demotion was "not retaliation for whistleblowing" but, as the district court said, for the "unlawful act" of releasing a departmental report in knowing de-

fiance of a valid departmental regulation. Such a situation does not pose a violation of the employee's right of free speech.

24. The dissent gives a distorted picture of the regulation. It quotes the preamble to the regulation and the preamble to the State Freedom of Information Act and would deduce from these preambles the scope of the regulation or statute and the procedure to be followed thereunder. The general language of the two preambles, however, is followed in both instances by specific provisions prescribing expressly the procedure which was to be followed in the release of any documents. These express, specific provisions control in both instances. Neither of them authorized *the release by Jurgensen* of the document in question here, as we point out later herein.

tion of the plaintiff in *Connick*—and equally so as the action of the employee in *Special Counsel.* No employee, whether private or public, has a right to violate knowingly a valid regulation governing his conduct as an employee any more than a citizen has a right to disregard or violate a valid law. The plaintiff has, however, sought to excuse his violation. We, therefore, turn to a consideration of the excuses offered by the plaintiff for his violation of the departmental regulations.

The first excuse offered by the plaintiff for his release of the report "despite departmental rules" was that he "felt [the report] was a public document and that perhaps the person that was to be authorized to release [under the regulation] was questionable in [his] mind."[25] His second justification was that, though there are "rules" such as 401, that "doesn't mean the rules are right, sir. Rules can be contrary to law." Finally, he offered the explanation: "Basically, because I felt the county had several months, nearly a year, to address the problems in the EOC and I was not seeing the major areas addressed at all." The interesting thing about these excuses was that implicit in all of them was an admission by the plaintiff of a disregard on his part of what he knew to be the rules of the Department.

■ Considering the plaintiff's first excuse: Neither the plaintiff nor the district judge articulated any express rationale for the finding that the inspection report was a "public document" which, though acquired by the plaintiff surreptitiously in his capacity of an employee, could be "distributed" publicly in complete disregard of departmental regulations. The nearest to a specific excuse for plaintiff's characterization of the report as a "public document" was his ambiguous declaration that "common sense told [him] the report was a public document." Ordinarily, whether an agency inspection report is a public document or not is a matter not of common sense but is dependent on statutory definition. *See In Re Toth,* 175 N.J.Super. 254, 418 A.2d 272, 275 (1980). The dissenting opinion adds, however, as a ground for finding the report a public document what it calls the opinion of an "expert." This "expert" was a former policeman who expressed the opinion "that making the report available to the press would not damage the police department," that "it dealt largely with managerial problems" and that "similar reports are frequently made available to the press."[26] This is a far cry from an opinion by a recognized "expert" that the report was a public document. Such testimony characterizing the report as "largely managerial" interestingly enough removes much of the character of the matter as one of broad public interest and certainly contributes nothing to establishing the report as a public document. Simply because the "expert" opined that the distribution of the report might "have ultimately a beneficial effect for the police department" is not a criterion for establishment of a report as a public document.[27] Even less convincing is the

---

25. The plaintiff never explained what he meant by the cryptic characterization of the "person ... authorized to release" as "questionable."

26. This is the language of the dissent.

27. The further assumption by the dissent that the testimony of this expert "clearly establish[ed] that Jurgensen's action did not impede the efficient operation of the Center or lower the morale of its employees" is not supported by the testimony of the expert. The issue was not simply the release by Jurgensen of a document which he had purloined without authority from the files of the Department as the dissent assumes, but that he had done so in knowing violation of a valid departmental regulation. The expert never testified that a knowing viola-

tion of a valid regulation dealing with an employee's duties as an employee would not "impede the efficient operation of the Center,'" or disrupt the orderly operation of the Department. He was actually never asked that question. As the quotation from the dissent demonstrates, the expert was not advised of the regulations or that Jurgensen had knowingly violated them. Ergo, his testimony could not be construed as condoning or excusing such insubordination as in no way affecting employee discipline or the efficient operation of the Center. It would seem beyond argument that to wink at or to disregard a knowing violation of departmental regulations on the part of an employee would encourage violations by other employees and would manifestly disrupt discipline. *Con-*

statement that such reports are "frequently made available to the press." More important is the fact that neither the plaintiff nor the dissent points directly to any Virginia statute or precedent declaring a report such as that involved here to be a "public document." Apparently, the plaintiff and the district judge premised their conclusion of a legal basis for declaring the report a "public document" on their assumption that the report was releasable under the State FOIA and therefore could properly be catalogued as a public document. We reach this conclusion because the plaintiff procured after this suit was begun, and offered in evidence, an opinion of an assistant Commonwealth Attorney General that the report was not within one of the specific exemptions from disclosure provided under the State FOIA. But it should be noted that there are seventeen other exemptions from disclosure in the Act and the opinion of the assistant Attorney General in his letter did not refer to any of these other seventeen exemptions. We accordingly deduce that the position of the plaintiff was that departmental regulation 401, insofar as it forbade the release of the inspection report by the plaintiff, was invalid for repugnancy to the State FOIA.[28] This conclusion follows from the plaintiff's statement: "Rules can be contrary to law."

■ The State FOIA, however, cannot be enlisted as a justification for the plaintiff's action in surreptitiously taking the inspection report from the files of the Department and giving that report to the *Post* reporter. The dissent quotes language from the general language of the preamble of the Act to support its finding that the purpose of the Act was to justify, if not encourage, the very action taken by Jurgensen. This reasoning, based as as it is on the language in the preamble, rests on what has been correctly described as "an erroneous perception of the operation and significance of such language." The "preamble no doubt contributes to a general understanding of a statute, but it is not an operative part of the statute and it does not enlarge or confer powers on administrative agencies or officers. Where the enacting or operative parts of a statute are unambiguous, the meaning of the statute cannot be controlled by language in the preamble. The operative provisions of statutes are those which prescribe rights and duties and otherwise declare the legislative will." *Association of Am. Railroads v. Costle*, 562 F.2d 1310, 1316 (D.C. Cir.1977). This statement conforms to the language of the Supreme Court in *Yazoo Railroad Co. v. Thomas*, 132 U.S. 174, 188, 10 S.Ct. 68, 73, 33 L.Ed. 302 (1889) ("... the preamble is no part of the act, and cannot enlarge or confer powers, nor control the words of the act ....") If "the operative sections [of a section] are clear and unambiguous," the preamble of the statute is "neither essential nor controlling in the construction of the Act." *Hughes Tool Company v. Meier*, 486 F.2d 593, 596 (10th Cir.1973). Again, this is but a restatement of the rule enunciated in *Coosaw Mining Co. v. South Carolina*, 144 U.S. 550, 563, 12 S.Ct. 689, 692, 36 L.Ed. 537 (1892), where the Supreme Court said the preamble could only be resorted to "to aid in the construction of the enacting clause, when any ambiguity exists." The enabling section of the State FOIA is clear and unambiguous. Moreover, the purpose of this Act was to avoid the very thing that happened here. It was intended to remove any necessity for a reporter seeking access to a report or document in an agency's file to resort to subornation on the part of public employees by providing him with a prompt and easy remedy to secure access to such document. If the agency refused access improperly, the reporter had his remedy and would be awarded in addition attorney's fees and costs against the agen-

---

*nick,* under those circumstances, sustained disciplinary action against the truant employee for her knowing violation of a valid rule of her employment.

**28.** It does not seem that the district judge actually considered the regulation invalid or repugnant. It is of interest that the trial judge in his jury instruction declared this regulation to be a "reasonable" one.

cy. There is accordingly no need for the reporter to engage in protracted pressure to induce a public employee to engage in subornation in violation of his duty under the regulations governing his employment. This method of pressuring public employees surreptitiously to purloin from their agency's files governmental reports in plain violation of the employee's authority rather than resorting to the procedure provided by the legislature for such disclosure is one which courts should hesitate to encourage.

The State FOIA in its enabling provision gives no agency employee the right to remove a report or document from the files and records of the agency and to publish it. The State Act provides expressly and unambiguously only that "official records shall be open for inspection and copying by a citizen of this Commonwealth during the regular office hours of the custodian of such records." § 2.1–342. Virginia Code. If the citizen is denied this right to inspect and copy in the office of the custodian of the records, he is provided with a prompt and easy judicial remedy for the enforcement of his right "by petition for mandamus or injunction" in the courts. § 2.1–346, Virginia Code. As we have seen, the Act relates only to the right to inspect and copy "during regular office hours" in the office of the "custodian" of "official records." It plainly did not clothe the plaintiff with the right to remove files, reports or documents from the police department in knowing violation of his obligation as an employee under the regulations of the Department, which is what Jurgen-

sen did and for which he faced the possibility of demotion.[29]

■ Nor can it be argued that the regulation was invalid for repugnancy to the state FOIA. Even were the state FOIA as broad in its right of disclosure as the federal FOIA there would be no repugnancy between a regulation such as 401 and the FOIA. This was clearly recognized in *Martin v. Lauer*, 686 F.2d 24, 33 (D.C.Cir. 1982):

> "Although the Freedom of Information Act is a disclosure statute rather than a withholding statute, *see Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), it recognizes specific public and private interests in limiting disclosure. A decision whether to release FOIA-exempt material, therefore, requires a considered balancing of the public interest in disclosure of particular material and the interests in nondisclosure acknowledged by the statutory exemptions. Regulations governing the processing of FOIA requests serve to assure that such an accommodation of competing interests will occur prior to the release of government information. We do not doubt that, in general, these regulations serve substantial governmental interests."

After all, 401 does not proscribe inspection and copying of an agency report. What 401 does is to prescribe a formula for processing applications for the exercise of that right by identifying the specific officers in the Department with the exclusive authority to make a report public. There is nothing either illegal or unreasonable in such a

---

**29.** This is an important case in the precedent it establishes. If the judgment in this case is to be affirmed, disgruntled public employees will be encouraged to purloin and publish public records of every type under the claim that the document was one which, *in the opinion of the employee*, was of public interest and should be published. It may be such that the precedent will not be extended to documents relating to national defense, etc., but, under the precedent of this case, if the right of the plaintiff is sustained, the employee would be entitled to determine for himself whether the matter was one of national defense and, only after the document was published would the issue of the propriety of the publication be resolved. It was to prevent this disorderly procedure that both the federal and the state Freedom of Information or "Sunshine," acts, to which we refer later, were enacted. Anyone who can show that a document is disclosable can obtain in a summary proceeding disclosure. Should we not follow this Act in preference to establishing the disorganizing precedent of investing every public employee with the constitutional right to ferret out surreptitiously public documents and to distribute them at will?

regulation. It is obvious that not every employee in a department—especially a large department such as is involved here—may be permitted to determine whether any report or statement in the department can be released publicly under the law or procedures of the defendant Department. A procedure permitting such a practice would be an invitation to confusion. There has to be some established procedure for the orderly processing of requests for reports or documents and that is precisely what 401 was intended to do. Such a regulation was of special importance in a police department where so many documents of a confidential character are involved. The fact that the report in this case was prosaic cannot invalidate the regulation as applied to this particular report. To hold that an employee may release a report if he concludes it is not confidential would create the very confusion the regulation was intended to avoid. The regulation has to be uniform and the releasability or disclosability of any report has to be determined by a properly designated official of the agency in all cases. Any other rule would invite administrative chaos.[30]

We accordingly conclude that the departmental regulation which forbade the release of the inspection report by the plaintiff was a perfectly reasonable and valid regulation. The defendants were not required to tolerate or wink at the violation of said regulation by the plaintiff nor could the plaintiff avoid punishment for his transgression by a spurious claim of free speech. By conceding as he did that his demotion was the result of his violation of the regulation, the plaintiff admitted that a violation of his right of free speech was not the "but for" or "motivating" cause of his demotion. His action for an alleged violation of his right of free speech should have been dismissed for failure to meet the sec-

ond requirement established by *Mt. Healthy* for a valid cause of action for such violation.

The dissent cites and relies for its ruling on *Czurlanis v. Albanese*, 721 F.2d 98 (3d Cir.1983). We suggest with deference, it overlooks the sharp distinction between that case and the one under review. In the first place, the court in *Czurlanis* began by recognizing expressly the applicability of *Mt. Healthy* to a case such as that here. It stated without equivocation that, under *Mt. Healthy*, the rule is that "[i]f successful in demonstrating that the activity was protected, the plaintiff must then show that it was a substantial or motivating factor in the alleged retaliatory action," citing *Mt. Healthy*, 721 F.2d at 103. It, however, declared, that—and this is the significant distinction between *Czurlanis* and this case—it did not have to dwell on that point since "[d]efendants concede that the two suspensions of Czurlanis were the direct result of his speech at the two Board meetings." *There is no such concession in this case.* On the contrary, the position of the defendants, unlike the defendants in *Czurlanis,* is that it was not the exercise of any right of free speech which was the "but for" cause of Jurgensen's threatened discipline. Jurgensen had for a long time, by his own testimony, been permitted to complain of what he regarded as onerous working conditions in the unit. He had done so to other employees and to his superiors. He had even done so in a public meeting of the Civil Service Commission. All of this he had done without experiencing any harassment, censorship or disciplinary action. His right of free speech had been freely recognized. What could not be recognized and what could not be tolerated was the surreptitious purloining of documents from the files of the Department and the giving of such documents to a

---

**30.** The dissent seems to assume that the regulation in question, if applied, "override[s] the constitutional rights an employee possesses as a citizen." As applied in this case, the regulation does not—to repeat what was said earlier—violate the employee's free speech rights nor has the Department attempted to give it such an application. The Department never attempted to deny to Jurgensen the right to voice freely his opinion on conditions in the unit; it did attempt, by a valid regulation, to prescribe the procedure to be followed in seeking *documents in the files of an agency.*

reporter of the *Post* in violation of a plain and unambiguous departmental regulation, the validity of which may not be challenged. This is thus a case unlike *Czurlanis*. This is a case where clearly the "but for" and the "motivating" cause of the threatened disciplining of Jurgensen was not his exercise of the right of free speech but his violation of a valid departmental regulation.

Assuming, though, that in some way free speech was involved in this case and that the *Pickering-Connick* balancing test was applicable it is necessary at the threshold as the court sought to do in *Czurlanis*, to identify the free speech right allegedly violated. In this case, the plaintiff's claim must rest on the premise that the content of the inspection report which he released or "distributed" constituted a matter of public concern. Whether it did and to what extent, is a question that can be discovered only by limiting our inquiry to the language of the inspection report. It matters not that the plaintiff and others had criticized both privately and publicly working conditions in EOC before the report was released. As we have said, the plaintiff had even carried prior complaints on his part about working conditions in EOC "through channels" and publicly before the employees in EOC to be interviewed by reporters. There had been no attempt to censure the plaintiff in this regard on the part of the defendants nor had any employee been harassed, criticized or disciplined for criticisms, either privately or publicly. But, if we assume the publication of the report as an exercise of the right of free speech, the question becomes whether the inspection report had more than limited public interest. It seems pretty obvious that the report did not include material of any substantial public concern. As we have said, it brought "to light [no] actual or potential wrongdoing or breach of trust;" it dealt more accurately with what would be characterized as "internal office policy" of an agency, *Connick v. Myers*,

103 S.Ct. at 1688, 1690–91, and with the "pay, hours and conditions of employment," which under *Czurlanis'* interpretation of *Connick*, did not qualify of sufficient public concern as to justify First Amendment protection.[31] This is the type of "speech" which qualifies at best for limited public concern and in connection with which deference to agency judgment was declared in *Connick* to be "appropriate."

On the other hand, it is unquestioned that the plaintiff had violated knowingly a departmental rule. He was a supervisor and as such owed a special responsibility to obey the rules. The defendants felt they could not tolerate the plaintiff's violation of the regulations without creating a real probability of a severe weakening of respect for regulations on the part of all employees in the Department. The plaintiff's act of insubordination in disregarding knowingly the departmental regulations both justified and demanded disciplinary action. The offense of the plaintiff in this case was far more serious than that of the employee in *Connick v. Myers*, where, after applying the *Pickering* test as there expounded, the discharge of the employee was upheld. That case is clear authority for the action taken by the defendants in this case.

As we have said this case is stronger than *Connick* in favor of the defendants under the second prong of *Mt. Healthy;* it is similarly as strong as *Connick* under the application of the *Pickering-Connick* test. The report in this case had no more the quality of a matter of public concern than the language of the plaintiff in *Connick* and the evidence of insubordination was even more compelling than in *Connick*. In *Connick* there was no express regulation prohibiting the employee's conduct as there was here nor was there any showing of actual knowledge by the employee in *Connick* that she was violating a departmental regulation as was the case here. Further,

---

**31.** It was in order to underscore this point that we have painstakingly stated the major conclusions of the inspection report itself and of the steps taken by the Department to implement the report.

the questionnaire distributed by the employee in *Connick* had been prepared by her and was her property; the internal report distributed by the plaintiff was the property of the Department and had been removed from the Department's files by the plaintiff without authority and in violation of specific regulations. The plaintiff's demotion in this case offended the First Amendment even less than the employee's action in *Connick*. It follows that, even under a strict application of the *Pickering-Connick* test, there was no First Amendment right of action in favor of the plaintiff.

 Since we are of the opinion that there was no violation of the plaintiff's right of free speech in defendants' action looking to plaintiff's demotion, it would also appear unnecessary for us to consider the other grounds of error assigned by the defendants relating to duress. Since, however, a considerable part of the trial was addressed to the validity of the plaintiff's voluntary agreement to a demotion and to his waiver of a grievance hearing and to the defendants' plea of mootness, it may not be amiss under the circumstances for us to comment on the contention of the plaintiff that his agreement to a demotion was procured by duress and that for this reason his consent to the demotion was not voluntary and not a basis for judicial relief. On a review of the record, we are unable to find sufficient evidence of duress to have warranted the district judge in submitting, as he did, that issue to the jury.

 The plaintiff's grounds for invoking the claim of duress, as a defense to his signed agreement to a demotion as explained in his testimony, were that (1) there "was a threat there for dismissal staring me in the face," (2) he was "having problems, domestic problems at the time and severe financial problems" and (3) he

"couldn't risk losing my job." It is settled law, though, that grounds numbers (2) and (3) are insufficient to establish duress.[32] Any circumstances for which the other party was not responsible cannot qualify as a basis for a finding of duress. As the Court put it in the case of *Jamestown Farmers Elevator, Inc. v. General Mills*, 552 F.2d 1285, 1290 (8th Cir.1977), the circumstances asserted by a party as a premise for a finding of duress must be "the result of wrongful coercive acts of the other party." This same rule was stated in *Chouinard v. Chouinard*, 568 F.2d 430, 434–35 (5th Cir. 1978); *Johnson, Drake & Piper, Inc. v. United States*, 531 F.2d 1037, 1042 (Ct.Cl. 1976) (the plea of duress is not permissible "where the defendant was not responsible for the conditions"); *Kohen v. H.S. Crocker Company*, 260 F.2d 790, 792 (5th Cir. 1958); *Business Incentives Co., Inc. v. Sony Corp. of America*, 397 F.Supp. 63, 69 (S.D.N.Y.1975) ("the alleged duress must be proven to have been the result of defendant's conduct and not of the plaintiff's own necessities"). Certainly it cannot be said that the defendants were in any way "responsible" for Jurgensen's "domestic" problems or his financial difficulties. It follows that these claims of duress must be dismissed.

The only other ground is the "threat of dismissal." The law is that a threat which may be sufficient to void an agreement exists only "[i]f a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative ...." Restatement (Second) of Contracts § 175 (1981). The Restatement proceeds to specify in § 176 when, under this rule, a threat may be deemed improper. These are:

> "(a) what is threatened is a crime or a tort, or the threat itself would be a

---

**32.** It is significant that the dissent never discusses at all the grounds on which the plaintiff rested his claim of duress. The dissent contends itself by finding duress by determining that the police authorities first suggested a demotion rather than the plaintiff. Who made the initial suggestion is not the important issue in determining whether there was duress. For a finding of duress, the Court must look to the grounds assigned by the plaintiff himself as the duress that rendered his action involuntary. The dissent, however, never examines these grounds or considers whether they will support a finding of duress.

crime or a tort if it resulted in obtaining property,

"(b) what is threatened is a criminal prosecution,

"(c) what is threatened is the use of civil process and the threat is made in bad faith, or

"(d) the threat is a breach of the duty of good faith and fair dealing under a contract with the recipient."

In connection with its comment on its specification (d), the Restatement said that "a threat to commence civil process, even if improper, may not amount to duress since defense of the threatened action is often a reasonable alternative." Major Coffelt, even under Jurgensen's own account of this interview, told Jurgensen that he was considering recommending through channels discipline that could range between demotion and termination. Chief Buracker did not state positively what action he would recommend on the basis of Major Coffelt's submission but according to Jurgensen he did add that his misconduct was a serious matter, particularly so since Jurgensen was a supervisor. Both the interviews of Jurgensen with Major Coffelt and Chief Buracker were at the instance of the plaintiff himself and the discussion with respect to what recommendation the two officers would make was initiated by the plaintiff. The officers did not call the plaintiff in and make a threat of filing an unfavorable recommendation on him; we repeat that the plaintiff was the initiator in each instance. Moreover, the plaintiff testified that he was thoroughly familiar with his rights under the Civil Service procedures. He had a right to seek relief under administrative proceedings provided under the Civil Service Act. The recommendation of Major Coffelt was not final; it did no more than start the process. The plaintiff had a plain administrative remedy even had Major Coffelt's statement been regarded as a threat, an inference we find highly questionable. These circumstances cannot qualify the interviews of Jurgensen with Major Coffelt and Chief Buracker as improper threats under the rule formulated in § 176 of the Restatement.

It follows that the settlement made by Jurgensen with the Department was not voidable for duress. Since the facts on which the plaintiff relied for such plea, taken as given by the plaintiff himself, were not sufficient to establish the type of duress that would permit the voidance of the agreement, it was the duty of the district court to have found the settlement valid. Such a ruling would have represented a disposition of the plaintiff's claim. Were it necessary for us to consider the plaintiff's claim of duress voiding his settlement agreement, it is thus obvious that the plaintiff's action would be found without merit.

We do not address the defendants' claim that the plaintiff was barred from maintaining this action for failure to exhaust state grievance procedures or the defendants' reliance by way of defense to this action on *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), finding such an inquiry unnecessary.

The judgment of the district court is accordingly reversed and the cause is remanded to the district court with directions for the entry of judgment consistent with the decision herein.

REVERSED and REMANDED WITH INSTRUCTIONS.

ERVIN, Circuit Judge, concurring separately:

I agree with the decision to reverse the judgment of the district court.

I write separately only to emphasize that while I am in accord with Judge Russell's view that the report released by Jurgensen did not deal with matters of "public concern" within the meaning of the decision of the Supreme Court in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), I am not persuaded by all that he has written in that portion of his opinion in which he seeks to balance the employee's interest in freedom of expression against the employer's interest in effective and efficient fulfillment of its responsibilities to

the public. In addition, I cannot accept the clear implication that when the balancing process is appropriate a finding that the employee has been guilty of "insubordination" in any form and under all circumstances automatically and irrevocably tips the scales in favor of the employer. Being convinced that once a determination has been made that the expression under scrutiny does not deal with a matter of "public concern," it is neither necessary nor appropriate to engage in such "interest balancing." I prefer to base the decision solely upon the ground that the audit report did not deal with a matter of "public concern." As was pointed out in *Connick*,

> ... if the speech or activity in question cannot be "fairly characterized as constituting speech [or activity] on a matter of public concern, it is unnecessary to scrutinize the reasons for [an employee's] discharge [or demotion]."

As our court has noted: "If the expression was not upon a matter of legitimate public concern, no first amendment protection against discharge exists...." *Jones v. Dodson*, 727 F.2d 1329, 1334 (4th Cir. 1984).

For these reasons, I would base the decision to reverse the district court entirely on the ground that as a matter of law the release of the audit report was not an expression upon a matter of legitimate public concern.

BUTZNER, Senior Circuit Judge, dissenting:

The Fairfax County police department's civilian-staffed Emergency Operations Center is officially described as "generally the first and often the only contact point between the Department and the public." Robert E. Jurgensen, a civilian employee of the Center, is a whistle blower. Not surprisingly, he incurred the displeasure of the top officers of the department when he furnished a newsman a copy of a report exposing the Center's inefficiency.[1] Because of this conduct, he was charged with violating a general order of the department that prohibited him from furnishing any information to the press, and the chief of police told him to take what the county insists was a voluntary demotion.

Jurgensen did not release the report to the press when it first became available to the department's employees. After eight months, however, he became concerned that little was being done to correct the serious deficiencies it disclosed. His concern increased when he realized that officials in the department were covering up by assuring the press that citizens were pleased with the department's performance and that it had good, top-level management. He then told a newsman about the problems revealed in the report, but the paper would not publish a story until his account of the department's difficulties

---

1. According to the 64–page report, its goal was: "Determine if the Emergency Operations Center is functioning efficiently and effectively." The objectives are outlines in the report as follows:

* Determine whether the equipment is adequate to accomplish the mission of the Emergency Operations Center.

* Determine whether the equipment is being utilized in the most efficient and effective manner.

* Determine whether the personnel are adequate to accomplish the mission of the Emergency Operations Center.

* Determine whether the personnel are being utilized in the most efficient and effective manner.

* Determine whether current policies, procedures, and regulations are adequate to accomplish the mission of the Emergency Operations Center.

* Determine whether current policies, procedures, and regulations are complied with.

* Determine the extent of the training given EOC personnel.

* Examine management practices.

The initial and concluding sentences of the three-page summary illustrate the significance of the report:

> The Emergency Operations Center is currently in a posture where its ability to function effectively is in question.
>
> * * * * * *
>
> The vital role that the Emergency Operations Center plays with respect to both the community and the Department demands assiduous attention to the issues raised in this inspection report.

was verified by the report. , Consequently, Jurgensen furnished the newsman a copy.

The police introduced no proof that the information Jurgensen orally gave the newsman and the report he subsequently furnished were false. A veteran employee, who had served since 1964 in the Center both as a uniformed officer and as a civilian, observed no drop in morale or efficiency after publication of the report. A ranking police officer conceded that he couldn't say the employees' performance was worse after the report was published.

Jurgensen neither sought nor received compensation, public acclaim, or prestige for furnishing the information to the newspaper. Indeed, he realized that his action would likely displease his superiors, but he believed he had an obligation to the county's citizens to make public the deficient service they were receiving. He testified:

.I felt I had a moral obligation, as I said before; that I had to do something and I knew there was, in fact, a code of ethics that was published by the county and I felt like I had an obligation to let people know, the citizens of Fairfax County, that the service they were getting was not up to what it should be.

 ❖ * * * * *

Common sense told me that it was a public document. The public had the right to know about the operations of their government. Taxes pay for the operation and I felt the public, paying that expense, had the right to know whether there was gross inefficiency in the system.

I

*Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 1690 and n. 7, 75 L.Ed.2d 708 (1983), which was decided after Jurgensen's trial, explains that whether "an em-

ployee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement as revealed by the whole record." This inquiry "is one of law not fact." Consequently, an appellate court is not bound by the constraints of the clearly erroneous standard of Federal Rule of Civil Procedure 52(a). Fortunately, the district court anticipated *Connick* and resolved this issue as a matter of law.

Jurgensen's common sense assessment of the nature of the report was confirmed by the district court. It recognized that the report dealt with a matter of public concern and characterized it as a public document. Its ruling is amply supported by both the law and the evidence. The report was not marked confidential. No police official or supervisor told Jurgensen that it was confidential. An expert witness, who had years of experience in law enforcement and administration, testified that making the report available to the press would not damage the police department; that it dealt largely with managerial problems; and that similar reports are frequently made available to the press. Referring to publication, the expert ventured the opinion: "As a matter of fact, it rather seems to me that it would have ultimately a beneficial effect for the police department."

The trial judge, who for many years had been a distinguished member of the Virginia judiciary, was familiar with Virginia's policy of public disclosure of the affairs of governmental agencies. His ruling about the public nature of the report is altogether consistent with the policy of the Commonwealth as declared by the General Assembly, and the county's policy as declared by the general orders of the police department.[2] The district court's ruling is also

---

**2.** Code of Virginia, § 2.1–340.1 provides:

It is the purpose of the General Assembly by providing this chapter to ensure to the people of this Commonwealth ready access to records in the custody of public officials and free entry to meetings of public bodies wherein the business of the people is being conduct-

ed. *This chapter recognizes that the affairs of government are not intended to be conducted in an atmosphere of secrecy since at all times the public is to be the beneficiary of any action taken at any level of government.* To the end that the purposes of this chapter may be realized, it shall be liberally construed to promote

consistent with the opinion of the Attorney General of Virginia on the subject.

A police official's refusal to let a newsman read the report does not establish that Jurgensen was put on notice that it was classified. Nor does this incident prove that the report did not address a matter of public interest. The police officials also denied the county budget office's request for a copy, although the report dealt in part with budgetary matters. Moreover, for nearly ten months, the officials withheld the report from the board of supervisors and the county executive, the highest officials of the county. Even then, they did not voluntarily disclose it. They supplied it only after a request from a deputy county executive who had been alerted to its existence by Jurgensen's disclosure to the press.

In light of this evidence, I cannot accept the officials' argument that Jurgensen knew the report was confidential and that it did not address a matter of public concern. One can draw the reasonable inference that denial of the report to the press and to the budget office was simply part of the officials' larger scheme to secrete the report from their superiors, the supervisors and the executive, who were clearly entitled to it.

Independently examining the record, I agree with the district court's conclusion that the report addressed a matter of public concern. I base my judgment on the content of the report, its form, and the context of its dissemination after considering all of the facts, the opinion of an expert, the authoritative declarations of public policy, and the opinion of the Attorney General pertaining to it. In sum, the court's ruling conformed to the requirements for determining this issue that are set forth in *Connick*, 103 S.Ct. at 1690–91.

## II

In *Jones v. Dodson*, 727 F.2d 1329, 1334 and 1340 (4th Cir.1984), we read *Connick*, 103 S.Ct. at 1692 n. 10, as characterizing the balancing test prescribed by *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), to be a question of law for decision by a district court without submission to a jury. *Pickering* explained the test in these terms:

> The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

Without the benefit of *Connick* and *Jones*, the district court submitted the *Pickering* balancing test to the jury, and it rendered a verdict for Jurgensen. Notwithstanding this procedural error, an appellate court is not precluded from making an independent judgment, as required by *Connick*, 103 S.Ct. at 1692 n. 10, on this issue. Indeed, this is the course followed by *Czurlanis v. Albanese*, 721 F.2d 98 (3d Cir.1983), where, as here, the record was sufficient for appellate purposes. On this premise, therefore, I will proceed to make an independent judgment of the balance

an increased awareness by all persons of governmental activities and afford every opportunity to citizens to witness the operations of government. Any exception or exemption from applicability shall be narrowly construed in order that no thing which should be public may be hidden from any person. (Emphasis added).

General order 401, in effect at the time, states in part:

[S]ince the department was created for and exists to serve and protect the public and is responsible to the public, the public has the right to be informed about police activities and operations.

The news media serve as important conduits of information to the public. A relationship of trust, cooperation and mutual respect between the police and the news media is essential to realization of their common objective of serving and informing the public. It is the policy of this department to make information on crimes and other incidents generally available to the news media, unless such information is legally privileged, would violate the constitutional rights of an accused or is otherwise specifically prohibited in this directive.

required by *Pickering* and *Connick*, without regard to the constraints usually placed upon an appellate court's review of a verdict.

The county contends that Jurgensen was subject to disciplinary action because he violated a police department general order that prohibited him from giving information to the press.[3] The county takes the position that this prohibition is absolute and that violation of the order is insubordination warranting discharge.

The district court rejected the county's absolute interpretation of the order. It recognized that the order could not suppress the rights of public employees, as citizens, that are protected by the first and fourteenth amendments. Also, in a post-judgment order, the court stated: "The report addressed certain inadequacies and problems which plagued this important part of the Fairfax County Police Department. Both the public and the [Emergency Operations Center] employees have been and will continue to be served through the public release of this report."

Upon consideration of the record, I conclude that Jurgensen's interest as a citizen, in disclosing the report to the press, outweighed the interest of the county, as an employer, in promoting the efficiency of the communications center through its orders, including those restricting access to the press. Jurgensen disclosed a matter of public interest. He did not merely voice a personal opinion, colored by his own perceptions of the condition of the Center. On the contrary, his disclosure of the Center's problems rested on an authoritative report that revealed in great detail the inefficiencies of the Center and recommended steps, including the expenditure of public funds, to remedy them. The report dealt with subjects that had no immediate impact on Jurgensen's position as an assistant squad supervisor. Unlike the plaintiff in *Connick*, who was facing a distasteful transfer, Jurgensen was not exploiting a personal grievance.

The evidence clearly establishes that Jurgensen's action did not impede the efficient operation of the Center or lower the morale of its employees. Moreover, disclosure did not have the potential of disrupting the operation of the Center. Indeed, the proof showed just the opposite. In the opinion of the expert, which was not refuted, and according to the appraisal of the district judge, disclosure served the interests of the Center as well as the citizens of the county. My independent review of the record persuades me that the expert and the judge were plainly right. Public awareness of the Center's needs with respect to equipment, personnel, training and funding objectively discussed in the report was likely to engender public response to these needs in view of the fact that the Center is the citizens' principal link to the police department.

In agreement with the district court, I cannot accept the argument that through promulgation of a general order restricting release of information to the press, police officials in every instance can override the constitutional rights an employee possesses as a citizen. The county's position is contrary to the Supreme Court's carefully structured balance of individual and governmental interests explained in *Pickering*, 391 U.S. 563, 88 S.Ct. 1731, and *Connick*, 103 S.Ct. 1684. In short, the county wrongfully equates whistle blowing with insubordination. For this reason, I believe that the violation of the general order cannot conclusively establish that Jurgensen's speech was unprotected, although his conduct is an element in the *Pickering* equation.

Nor can I accept the contention that enforcement, through disciplinary action, of the order restricting release of information to the press is essential to the efficient operation of the police department. Certainly enforcement of the order would be justified if the press were enlisted to support an employee's grievance, or if information were leaked pertaining to a current criminal investigation. When, however,

---

**3.** The text of the order appears in the majority opinion at 880–881.

the information furnished the press involves a matter of public concern, an employee cannot be punished for violation of the order. Punishment under these circumstances would elevate the order above the first amendment by giving undue weight to the claim of efficient operation of the department. No one, I suggest, would have the temerity to justify retaliation against an employee because he violated the order by disclosing corruption within the department. Clearly, corruption would be a matter of public concern. Deficiencies in equipment, training, personnel, and adequate financing—though less culpable than corruption—also hamper service to the public. These, too, are matters of public concern, which an employee, as a citizen, has a protected right to disclose, despite the order, without fear of retaliation.

Under somewhat similar circumstances where an employee was disciplined for violating a government department's "chain of command" policy by speaking at a public meeting of the county's government board about deficiencies in the department, the Court of Appeals for the Third Circuit said in *Czurlanis v. Albanese,* 721 F.2d 98, 106 (3d Cir.1983):

> A policy which would compel public employees to route complaints about poor departmental practices to the very officials responsible for those practices would impermissibly chill such speech.... It would deter "whistle blowing" by public employees on matters of public concern. It would deprive the public in general and its elected officials in particular of important information about the functioning of government departments. We do not read the "efficiency of public services" factor referred to in *Pickering* to extend to a chain-of-command policy as interpreted and applied by the defendants.

Moreover, with reference to the facts, an expert testified that publication of the report Jurgensen furnished the press would not damage the police department. Other witnesses testified that the department was not harmed or its efficiency impaired.

Thus, the county's argument that enforcement of the order against Jurgensen is necessary to promote the efficient operation of the department is refuted by both the law and the facts.

### III

The question whether Jurgensen took a voluntary demotion or acted under duress presented an issue for the jury. The record is replete with genuine issues of material fact and conflicting inferences that reasonably can be drawn from the evidence. Consequently, the district court did not err in denying a motion for summary judgment and submitting this issue to the jury. *American Fidelity & Casualty Co. v. London & Edinburgh Ins. Co.,* 354 F.2d 214, 216 (4th Cir.1965). In view of the jury's verdict and the court's denial of a motion notwithstanding the verdict, we are obliged to review the evidence and the reasonable inferences drawn from it in the light most favorable to Jurgensen. *Warner v. Billups Eastern Petroleum Co.,* 406 F.2d 1058, 1059–60 (4th Cir.1969).

My reasons for sustaining the jury's verdict and the court's judgment on the issue of duress can be stated briefly. Central to this issue, as the case was presented to the jury, was the dispute over who proposed the demotion. Police officials testified that Jurgensen initiated the request for a voluntary demotion because of personal problems and financial hardships that would become worse if he lost his job. The chief of police testified:

> Q To try to clear up one issue with regard to your testimony, who, to the best of your recollection stated that he wanted to take a voluntary demotion? Who was the first individual in the room to bring up the issue of a voluntary demotion?
>
> A Bob Jurgensen.

In contrast, Jurgensen testified:

> Q Who first referred to a voluntary demotion?
>
> A Colonel Buracker [the chief] made the statement he was not a vindictive man and he said, "You don't go back to

the *Washington Post*"—and this was a statement of what he was going to do, and he looked right at me and he had the folder on his desk, and, "You take a voluntary demotion and you don't talk to the *Washington Post*," and he took the folder and closed the file. I had the distinct impression that the file was the investigation.

The record also discloses that at the time the chief told Jurgensen to take a voluntary demotion he was charged with violating § 204.4 of the general order for furnishing the report to the press. Jurgensen had readily admitted to his superior what he had done, and from a conference with this official and the chief, he realized that he was confronted with the likelihood of discharge. Jurgensen then acceded to the chief's terms—"take a voluntary demotion" and "don't talk to the *Washington Post*." A secretary immediately typed a formal request for a voluntary demotion which he signed and the chief approved.

A week later, Jurgensen wrote the chief that he revoked his request for a voluntary demotion because it was made under duress. He asked that he be allowed to follow administrative and civil service remedies with regard to any disciplinary action the chief would impose. The chief rejected Jurgensen's plea.

The jury credited Jurgensen. After being fully and properly instructed on the question whether the demotion was voluntary or imposed by duress, the jury returned a verdict for Jurgensen.

### IV

Contrary to the county's argument, Jurgensen's proof of improper demotion satisfies the criteria of *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The record establishes that his conduct in furnishing the report to the press was constitutionally protected as appraised by the balancing test of *Pickering* and *Connick*. The record also shows conclusively that his protected conduct motivated the police officials to punish him. His superiors do not suggest that his work was unsatisfactory, except for his disclosure to the press.

Other assignments of error presented by both parties do not warrant reversal or modification of the district court's judgment. Dissenting, I would affirm.