Victor A. GILLES, Plaintiff,

v.

J. Lee ALLEY, Defendant.

Civ. A. No. 83–H–496–N.

United States District Court,
M.D. Alabama, N.D.

June 12, 1984.

---

Prestwood & Rosser, Alvin T. Prestwood and Claude P. Rosser, Jr., Montgomery, Ala., for plaintiff.

Charles H. Barnes, State Dept. of Agriculture and Industries, Montgomery, Ala., for defendant.

## MEMORANDUM OPINION

HOBBS, District Judge.

This cause is before the Court on defendant's renewed motion for summary judgment. Plaintiff is an administrative officer employed by the United States Department of Agriculture, Animal and Plant Health Inspection Service, Veterinary Services, and was formerly assigned to Alabama. Defendant is the Alabama State Veterinarian, and the Director of the Animal Indus-

try Division, Alabama Department of Agriculture and Industries. Plaintiff's responsibility was to ensure compliance with various federal policies and regulations in Alabama. In part, this required him to ensure that Alabama's Animal Industry Division followed federal guidelines pursuant to cooperative agreements entered into by the United States and the State of Alabama. On May 2, 1983, largely at defendant's urging, plaintiff's federal superiors transferred him to Jackson, Mississippi. Plaintiff did not appeal the transfer through the administrative procedures available to him.

Plaintiff filed suit on May 17, 1983, claiming that defendant had urged his transfer in retaliation for plaintiff reporting on several occasions that defendant and the state veterinary service were not following federal guidelines. Plaintiff claims that when defendant urged his transfer allegedly because of plaintiff's adverse report, this violated plaintiff's First Amendment rights. On November 18, 1983, plaintiff amended his complaint to state causes of action for conspiracy under 42 U.S.C. § 1985(1), and for tortious interference with business under state law. On January 27, 1984, the Court denied defendant's motion for summary judgment, but indicated that defendant may be entitled to summary judgment on the basis of good faith immunity after further discovery. The Court stated that it could best resolve the matter after being provided with the depositions of the parties. On May 4, 1984, defendant renewed his motion for summary judgment. This motion was submitted for decision on May 23. On May 29, plaintiff again moved to amend his complaint.

The parties have now provided the Court with a large volume of discovery materials. In addition to the deposition of the plaintiff, the Court has received the affidavits and depositions of well over thirty federal and state employees. The Court finds that defendant's motion is due to be granted.

## FACTS

To an extent, the dispute giving rise to this action was predictable. The federal

and state governments have operated a joint program in Alabama concerned with brucellosis eradication. This program in part provides the state with federal funding. Plaintiff's job as administrative officer required him often to check on state expenditures of federal funds, particularly supply orders and travel vouchers. The record establishes that plaintiff on many occasions questioned or rejected such expenditures. The problems appear to have been complicated because federal and state employees shared office space and the cooperative agreement lacked sufficient specificity.

The record establishes beyond dispute that plaintiff's activities provoked a startling amount of complaints and ill feelings among both state and federal employees. The problem does not appear to have been over the correctness of plaintiff's actions; in fact, plaintiff's supervisor, Dr. Mixson, testified that plaintiff is a competent administrative officer and is usually right. Rather, the problem was plaintiff's abrasive manner of dealing with other employees. Over thirty persons who worked with plaintiff have filed affidavits and depositions, recounting numerous specific instances where in their opinion plaintiff's behavior was either improper or needlessly created friction in employment relations. These employees also have expressed the opinion, with varying degrees of severity, that plaintiff was disruptive and difficult to work with. Many of these persons made defendant and other supervisors aware of these complaints. In addition, defendant in his answers to interrogatories listed over fifty persons who complained to him about plaintiff. Because the complaints all fit one of two general descriptions, they can easily be summarized.

One very common complaint was that plaintiff arbitrarily refused to fill or reduced supply orders. Many employees complained that plaintiff did this based on his opinion as to their needs, although there is evidence to show that plaintiff ordinarily was correct in his actions. Many employees also complained, however, that plaintiff gave no explanations when he refused to fill their orders.

The other major complaint was over plaintiff's manner of dealing with people. Different persons employed different adjectives—such as high-handed, arrogant, and rude—but the overwhelming consensus among both federal and state employees was that plaintiff's manner was disruptive and hurt morale. Some employees testified as to instances where plaintiff used profanity in reprimanding them verbally. Some testified that he reprimanded them in front of other workers. Some testified that he reprimanded them even though he had no supervisory authority over them. Many of the employees stated that plaintiff led them to believe that he considered them stupid or dishonest. This problem was especially acute with the state employees, because they believed that plaintiff thought they were trying to cheat the federal government.

Two instances that were documented provide representative examples of the complaints appearing in the record. On August 7, 1980, plaintiff sent a memorandum to Doug Moring, over whom plaintiff had no supervisory authority. Plaintiff reprimanded Moring for making too many phone calls to the office, and stated that Moring's "carelessness in submitting incomplete [sic] claims ... causes much extra work that cannot be justified." Plaintiff went on to state that Moring's "carelessness" had caused the payment of an improper claim, and concluded, "[I]t is suggested you contact your supervisor for special instructions as necessary, so that all of your paperwork will be more acceptable when it arrives in the office." According to plaintiff's deposition, his superior composed this letter and asked plaintiff to sign it, which plaintiff did. Moring's supervisor read the letter, but gave no instructions. On January 5, 1982, plaintiff sent a signed note to Miles Albright, an employee not under plaintiff's supervision. The note read in part, "Why did you lie to Mixson about not being able to get these forms? ... Can a person go to hell for lying?"

Plaintiff in his deposition and affidavit has disputed the validity of the complaints against him. In his affidavit, he disputes all of the assertions of the state employees in their affidavits. He also states that he has "always treated people with respect and [has] never had any problems in the past with dealing with people." At his deposition he testified that people complained simply because they did not like having their supply orders reduced. He also testified that, based on his "feelings," he believed that state and federal employees had been instructed by somebody to complain about him. Plaintiff testified that he would have been proven correct in most of the dispute that arose if Dr. M.A. Mixson, plaintiff's supervisor and the Veterinarian-in-Charge for Alabama, had followed up on them.

Plaintiff came to Alabama in mid-1979, and the complaints began soon after. Mixson testified that he received numerous complaints in 1980 and 1981 about the way plaintiff dealt with people and about plaintiff's manner of handling supply orders. Mixson began keeping notes on plaintiff because he received information that plaintiff was keeping notes on him in preparation for an investigation of Mixson. These notes list a long series of problems with and complaints about plaintiff, although some also are complimentary to plaintiff.

In 1981, Mixson asked for an investigation into Alabama's compliance with the cooperative agreement. He did so because of plaintiff's reports that defendant and his subordinates were not complying in numerous respects. According to Mixson, the investigation solved some problems, and showed that the cooperative agreement was too vague. He testified that "a good number" of plaintiff's charges "were not valid." According to plaintiff, the investigation was not carried far enough.

Dr. John C. Jefferies, who was the director of the Veterinary Services for the Southeastern Region and thus was Mixson's supervisor, also received complaints about plaintiff and thus asked for a confidential report on plaintiff's performance.

Arthur Wilson, a management analyst, visited the office in Alabama and interviewed federal employees. He reported in a memorandum dated October 8, 1981, that he found "a strong feeling of discontent and resentment toward" plaintiff. The primary criticisms concerned plaintiff's arbitrary reduction of supply orders and the tone of plaintiff's written and oral communications. Wilson stated that he had seen some of the communications, and that they "often contain[ed] harsh reprimands or [were] perceived to imply a lack of integrity or intelligence on the part of the recipient." He also noted that plaintiff's communications often went directly to the individual rather than through established supervisory channels. Wilson did state that plaintiff did a thorough job of pointing out errors. He also noted several circumstances not of plaintiff's doing that may have contributed to tensions in the office. Wilson concluded in part that reprimands should come from supervisors and not from plaintiff, that plaintiff should be counselled about his methods of dealing with others, and that supply orders should not be reduced without consulting appropriate supervisors. Defendant was not shown or informed of this report.

Plaintiff at his deposition took issue with Wilson's report. He testified that some unnamed person furnished Wilson with a hand-picked list of people to interview, and that the people chosen all had gripes with plaintiff. Plaintiff stated that the federal officials who sent Wilson wanted a one-sided report to appease defendant. He did not refer by this to Jefferies, but he stated that Jefferies also wanted to appease defendant. Plaintiff testified that some federal official above Jefferies in the chain of command conspired with defendant against plaintiff. Plaintiff also testified that he has never reprimanded anybody, and that he has never sent a harsh communication. He stated that Wilson did not know the meaning of "reprimand" or "harsh." Plaintiff also stated that it was proper for an administrative officer to communicate directly with individual employees. Plain-

tiff admitted that Wilson's report was correct in that people did gripe.

Shortly after receiving Wilson's report, Jefferies talked with Mixson and defendant in St. Louis. Defendant complained about plaintiff, and Mixson agreed with defendant. Jefferies told defendant to put his complaints in writing. As a result, defendant wrote a letter to Jefferies dated October 28, 1981, in which he stated that plaintiff's attitude was undermining the cooperative spirit of the joint program. He stated, "People who are constantly being picked at, not provided with needed materials and supplies to work with, being treated as suspected thieves, or in general, being treated as peons, will not maintain a willingness or desire to do a good job." Defendant urged Jefferies to remove plaintiff from Alabama.

As a result of Wilson's report, defendant's letter, and the discussions he had had with the people involved, Jefferies asked plaintiff and Mixson to meet with him in Tampa on February 9, 1982. In a letter dated February 24, confirming their discussion, Jefferies told plaintiff that he was considered to be capable and knowledgeable, but that he had been reported to be "harsh, tactless, overly critical, and short when dealing with office and field employees." Jefferies urged plaintiff to improve his attitude "so that we receive no more complaints from the State of Alabama and our field and office employees." He suggested that plaintiff consider specialized training courses, and set May 28, 1982, as a target date for assessing the situation. Jefferies in concluding told plaintiff that if he continued to receive complaints he would recommend plaintiff's transfer.

Mixson testified that the complaints decreased after early 1982, although he still received "a few," not all from defendant. Some employees testified that the supply problems ceased during plaintiff's last year in Alabama. Of the many complaints to which the various state and federal employees testified, the date of occurrence was entirely unclear as to a large number. Of the remainder, most, but not all, occurred in 1980 or 1981. Dr. Donald J. Cheatham, who came to the Alabama office in April 1982, testified that he heard numerous complaints about plaintiff during plaintiff's last year. Finally, virtually all of the employees who have given affidavits or depositions stated that plaintiff was difficult to work with, and none indicated that this problem ever disappeared or even improved.

The record discloses several possible reasons for the decrease in complaints during plaintiff's last year. Mixson testified that people may have become accustomed to the situation. He also testified that after Jefferies' intervention plaintiff's duties were reduced and he was closely monitored, and that either Mixson or Dr. Richard Reese would review any questions about supply order with plaintiff before any action was taken. Plaintiff testified that the complaints decreased because people learned to do a better job in submitting supply orders. Plaintiff added that he made few if any changes as a result of his discussion with Jefferies. The changes plaintiff could recall were entirely procedural and not in plaintiff's manner of dealing with people.

Jefferies met again with plaintiff on June 3, 1982, and also with Mixson and defendant. Mixson and defendant stated that the situation had improved and was "tolerable," but defendant still wanted plaintiff to be transferred. Jefferies testified that plaintiff was defensive, and maintained that Wilson had set him up. Jefferies told defendant that further incidents would have to be documented. Jefferies met defendant again in Nashville in November 1982, and defendant stated that there still were problems.

In early 1983, defendant called Jefferies to urge plaintiff's transfer. Jefferies told him to write a letter. In his letter, dated January 7, 1983, defendant stated that plaintiff's "apparent total distrust of State personnel and his apparent belief that we are attempting to gig USDA and Veterinary Services in every way possible have totally destroyed working relations and cooperativeness." Defendant cited three ac-

tions that he believed exhibited plaintiff's disregard for cooperative relations. The testimony of Mixson and Reese establishes that two of these actions were not plaintiff's. The third involved the placement by plaintiff of some new equipment in the Program Records section. Defendant stated that that section was already cramped for space and that plaintiff put the equipment there to antagonzie the employees. Mixson testified that the equipment was there over the holidays when only three or four employees were present, but that the employees nevertheless complained. Defendant closed his letter by urging Jefferies to begin procedures to remove plaintiff from Alabama.

After receiving defendant's letter, Jefferies met with his own supervisors, and they reached a joint decision to transfer plaintiff. They reached this decision because of plaintiff's inability to get along with State employees, and based it upon all of the available evidence. Jefferies made no effort to verify the complaints in defendant's final letter, and he testified that they would have transferred plaintiff even if they had known that the letter was a "complete lie." Plaintiff's transfer became effective in May 1983.

The remaining evidence that is pertinent to this motion pertains to plaintiff's conspiracy claim. Plaintiff appears to rely primarily upon the deposition of William Terry Groce. Groce testified that sometime within six months or less of plaintiff's departure he went to lunch with defendant, Dr. Curtis Christenberry, and either Cheatham or Dr. William Cowart. Groce stated that defendant asked the group to help him get plaintiff moved, and that the others said that they would. Groce stated that he told them that he wanted no part of it. Groce also testified that after the filing of this suit Dr. James M. Rushing told him that defendant asked Rushing for support in the suit. Groce stated that Rushing had asked his subordinates before the suit to report to him any instances in which they had problems getting supplies so he could report to defendant. Groce also stated

that Dr. Joseph Tipton had made the same request of his subordinates.

Tipton testified that he did not remember making such a request, but that he did receive complaints about plaintiff from his employees and that he reported them to somebody, although he was not sure to whom. He also stated that he attended a meeting with Mixson, defendant, and maybe Cowart or Christenberry shortly after plaintiff came to Alabama in which the group reported to Mixson that there were complaints about plaintiff and that something should be worked out.

Christenberry testified that defendant told him that defendant wanted plaintiff transferred due to the complaints defendant had received, and that defendant needed documentation of instances in which plaintiff had caused problems. This occurred around the time plaintiff left. Christenberry did not remember the incident to which Groce had testified. He did receive complaints about plaintiff.

Plaintiff testified that his claim that Tipton had conspired with defendant against him was based upon the fact that defendant and Tipton were very close and Tipton would do anything for defendant. Plaintiff also stated that he had heard that Tipton was "bad-mouthing" him all over north Alabama and asking people to complain about plaintiff. Plaintiff did not testify as to any specific instances of Tipton's "bad-mouthing," and he did not indicate that he had any personal knowledge of such activities.

## DISCUSSION

### I. *First Amendment Claim*

Defendant relies primarily on the defense of qualified immunity to defeat plaintiff's First Amendment claim. The Supreme Court recently addressed the proper standard for considering such a defense on a motion for summary judgment. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Court observed that substantial costs attend the trial of a nonmeritorious claim. Those costs include

the diversion of energy from public matters and the possible intimidation of public officials from performing their duties as well as the actual expense of litigation. *Id.* at 814, 102 S.Ct. at 2736. For this reason, the Court eliminated the subjective element of the good faith standard. The Court stated that that issue ordinarily required resolution by a jury, thus defeating both summary judgment and the Court's desire that "insubstantial claims should not proceed to trial." *Id.* at 816, 102 S.Ct. at 2737. The Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. If the law at the time of an official's action "was not clearly established," then the action should proceed no further. *Id.* If it was clearly established, then the qualified immunity defense should fail. *Id.* at 818–19, 102 S.Ct. at 2738–2739. In either case, however, "the defense would turn primarily on objective factors." *Id.* at 819, 102 S.Ct. at 2739.

In a case very similar to the present one, the Seventh Circuit affirmed the entry of summary judgment, in part on the basis of qualified immunity. In *Egger v. Phillips*, 710 F.2d 292 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983), plaintiff, a former FBI agent, sued his supervisor claiming that defendant had recommended plaintiff's transfer to a new duty station in retaliation for plaintiff's exercise of his First Amendment rights. Problems had arisen when plaintiff reported his suspicions that another agent in the same office was engaging in illegal activities. After plaintiff made his charges, his relations with the other agents in the office became severely strained, to the point that the other agents refused to work with plaintiff. Defendant based his transfer recommendation on these strained relations. The Seventh Circuit found summary judgment to be appropriate on the good faith issue, in spite of the fact that plaintiff appeared to have a reasonable basis for his charges, and in spite of the fact that the ill feelings toward plaintiff may have been caused by plaintiff's charges.

The court stated that the combined effect of three factors established defendant's good faith. The first two do not apply here. As support for its third ground, the court noted that "a substantial number of cases relied upon the potentially disruptive impact of employee criticism in upholding *discharges* based on speech." *Id.* at 315 (emphasis in original). The court concluded that a reasonable person could conclude that an employee's " 'accusations of misconduct against [his] co-employees, if likely to cause serious disharmony in the ... office, [are] not subject to constitutional protection,' *Atcherson v. Siebenmann* [605 F.2d 1058, 1065 (8th Cir.1979) ], or *at least* believe[ ] that a *transfer* would not constitute an abridgement of [the employee's] freedom of speech." 710 F.2d at 315 (emphasis in original). The *Egger* court believed that "one in [defendant's] position would reasonably view the relations between [plaintiff] and others as strained and, *notwithstanding the root cause of the strained relations,* it would appear to a reasonable person that a transfer recommendation would be lawful." *Id.* (emphasis added).

The standard for determining when an employee may be disciplined for causing disruption in the office with his speech originated in *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In that case, the Court noted that "it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* at 568, 88 S.Ct. at 1734. The Court sought to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* Contrary to plaintiff's assertion in brief, it is the responsibility of

the Court, and not the jury, to strike this balance. *Connick v. Myers*, 461 U.S. 138 at —— n. 7, ——–—— n. 10, 103 S.Ct. 1684, at 1690 n. 7, 1692 n. 10 (1983).

*Connick* elaborated upon the proper approach under *Pickering*. Although, as plaintiff points out, *Connick* was decided after the events at issue here occurred, the Court relied upon established principles, and *Connick* has relevance here. *See id.* at ——, ——, ——, 103 S.Ct. at 1688–1689, 1692. The *Connick* court stated:

> When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.

*Id.* at ——, 103 S.Ct. at 1692.

In the present case, defendant was confronted with evidence that working relationships had already been badly damaged. The record contains evidence of numerous, uncontroverted examples of plaintiff's tactless treatment of his coworkers, and plaintiff's conclusory statements that he was never harsh and never gave a reprimand are insufficient to raise a legitimate issue of fact. Furthermore, plaintiff received instructions from his superiors to change his manner of dealing with people, yet plaintiff testified that he made no changes.

■ This case is also analogous to *Egger* because there is no question that defendant and the other supervisors in the joint program were confronted by a host of complaints about plaintiff, whether meritorious or not. Under *Egger*, defendant could reasonably believe a transfer request to be lawful to alleviate strained relations in the office, regardless of the root cause of the strain. Thus, the law was not clear at the time of defendant's actions, nor is it clear now, that defendant's actions violated plaintiff's rights.

The Court is unpersuaded by plaintiff's arguments that this case should proceed to trial. Plaintiff's argument that defendant also is difficult to get along with is not pertinent, nor is his assertion that morale has not improved since plaintiff's departure. The Court disagrees with plaintiff's assertion that defendant's qualified immunity defense "must of necessity depend on whether Alley's actions were reasonable and were to ease disruption." Under *Harlow*, defendant's subjective intent is no longer relevant.

Aside from the *Pickering* issue, this case presents one other difficulty that the Court finds sufficient by itself to establish defendant's qualified immunity defense on this motion. Defendant here did not transfer plaintiff, nor did he have any authority over plaintiff whatsoever that would entitle him to recommend plaintiff's transfer. He simply complained to plaintiff's supervisors. The Court has located, and plaintiff has cited, no case that would afford plaintiff a cause of action under these circumstances. Plaintiff in this case advances a theory of liability of startling proportions. "Many, if not most employees confronted with an adverse personnel action would probably not be hard-pressed in remembering something they once said either to their supervisors or to co-workers which rubbed the boss the wrong way." *Egger*, 710 F.2d at 314 n. 26. Furthermore, the same employees probably would have little trouble linking their statements to concerns for office efficiency or productivity, thus necessitating a trial. Such a result would directly contravene the dictates of *Harlow*. Furthermore, liability under plaintiff's theory would not be confined to the "boss." It would extend to any public employee whose criticism had a causal connection to action taken against another employee. For instance, nearly every employee of the state or federal veterinary services in Alabama could potentially face liability in this suit. In seeking to assert his rights to sue anyone whose criticism of him could allegedly result from plaintiff's speech or conduct, plaintiff would fashion a remedy for himself that would stifle the speech of others. Who would be bold enough to criti-

cize plaintiff's job performance in his new job if such criticism brought a further transfer of plaintiff? The channels of communication between the top brass and employees would be dangerously clogged if plaintiff is correct that by such criticism an employee is subject to costly, time consuming litigation. By any standard, one in the position of defendant would not have known that by making an adverse report to plaintiff's supervisors, he would thereby violate plaintiff's First Amendment rights.

The former Fifth Circuit noted in *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858 (5th Cir.1970), that summary judgment is proper and indeed essential where a trial is likely to stifle the defendant's speech. *Id.* at 864–65. The court quoted *Washington Post Co. v. Keogh*, 365 F.2d 965 (D.C.Cir. 1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967), in which the D.C. Circuit stated that summary procedures are essential

> to prevent persons from being discouraged in the full and free exercise of their First Amendment rights.... Unless persons ... desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors. And to this extent debate on public issues and the conduct of public officials will become less uninhibited, less robust, and less wide-open, for self-censorship affecting the whole public is "hardly less virulent for being privately administered."

*Id.* at 968 (quoting *Smith v. People of State of California*, 361 U.S. 147, 154, 80 S.Ct. 215, 219, 4 L.Ed.2d 205 (1959)).

Plaintiff's theory in this case would contravene this principle. Defendant took no action; he simply made complaints to plaintiff's federal superiors. Defendant complained that plaintiff was destroying the cooperative spirit of the joint program, which is as surely a matter of public concern as was plaintiff's speech. Defendant could reasonably have believed his own speech to be protected by the First Amendment. Allowing this case to proceed to

trial would inhibit such speech. Thus, given the dearth of authority for plaintiff's position and the considerations weighing against it, the Court holds that defendant could not reasonably have expected that his actions were illegal.

## II. *Conspiracy Claim*

Although defendant's qualified immunity extends to plaintiff's claim under 42 U.S.C. § 1985(1), *Lawrence v. Acree*, 665 F.2d 1319, 1325 (D.C.Cir.1981), the Court also will address the merits of that claim. Plaintiff's first amendment claims that defendant conspired with Joseph Tipton to prevent plaintiff from discharging his duties as a federal official. Plaintiff now proposes to amend his complaint again to add Curtis Christenberry and James Rushing to the list of co-conspirators. Defendant has objected to plaintiff's second motion to amend, an objection that is especially understandable in light of the facts that neither party has deposed Rushing and the discovery deadline has now passed. Nevertheless, the Court concludes that there is no evidence to indicate that any of these three individuals conspired with defendant.

Nothing in the record indicates that any of these persons did or agreed to do anything wrongful or unlawful. The fact that they may have agreed to help get plaintiff transferred is insufficient to establish a conspiracy absent any evidence of intent to do something unlawful. The sole evidence of Tipton's, Rushing's, or Christenberry's role in the alleged conspiracy is that they were to inform defendant of any complaints about plaintiff, and this would be entirely lawful conduct. Similarly, all three could legitimately ask their employees for any complaints about plaintiff. There is no evidence that any of the three actually did anything other than possibly to bring some complaints to defendant, and no evidence that any of their actions actually aided defendant in getting plaintiff removed. *See Cole v. Gray*, 638 F.2d 804, 811 (5th Cir.), *cert. denied*, 454 U.S. 838, 102 S.Ct. 144, 70 L.Ed.2d 120 (1981). Obviously, plaintiff's testimony that Tipton would do anything for defendant, and that

Tipton "bad-mouthed" plaintiff is not evidence of conspiracy, apart from the fact that the latter testimony was hearsay. Thus, there is no genuine issue of fact that defendant conspired against plaintiff.

III.  *Interference with Business Claim*

■ Because the Court holds that plaintiff's First Amendment and conspiracy claims are due to be dismissed, the only remaining claim involves solely issues of state law. The Court additionally notes that the parties are not diverse, because plaintiff has maintained his permanent residence in Alabama. Accordingly, the Court declines to exercise pendent jurisdiction over plaintiff's state law claim. *See Jackson v. Stinchcomb*, 635 F.2d 462, 473 (5th Cir.1981).

A separate judgment will be entered in accordance with this memorandum opinion.