813 F.2d 401
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Julian D. HEISLUP, Sr. and Linda L. Dixon, Appellees,
v.
TOWN OF COLONIAL BEACH, VIRGINIA; Bernard George Denson,
individually and in official capacity as member of Council
of Town of Colonial Beach; Gloria T. Fenwick, individually
and in official capacity as member of Council of Town of
Colonial Beach; Edna C. Sydnor, individually and in
official capacity as member of Council of Town of Colonial
Beach; Thomas B. Rogers, individually and in official
capacity as member of Council of Town of Colonial Beach;
John A. Anderson, individually and in official capacity as
Chief of Police of Town of Colonial Beach; Marty J. Perry,
individually and in official capacity as police officer with
Town of Colonial Beach and Leroy H. Bernard, Appellants,
and
Josef W. Dunn, individually and in official capacity as Town
Manager of the Town of Colonial Beach, Defendant.
Conrad B. MATTOX, Jr. and S. Keith Barker, Appellants,
Julian D. Heislup, Sr. and Linda L. Dixon, Appellants,
v.
TOWN OF COLONIAL BEACH, VIRGINIA; Bernard George Denson,
individually and in his official capacity as member of
Council of Town of Colonial Beach; Gloria T. Fenwick,
individually and in her official capacity as member of
Council of Town of Colonial Beach; Edna C. Syndor,
individually and in her official capacity as member of
Council of Town of Colonial Beach; Thomas B. Rogers,
individually and in his official capacity as member of
Council of Town of Colonial Beach; John A. Anderson,
individually and in his official capacity as Chief of Police
of Town of Colonial Beach; Josef W. Dunn, individually and
in his official capacity as Town Manager of the Town of
Colonial Beach; Marty J. Perry, individually and in his
official capacity as police officer with Town of Colonial
Beach and Leroy H. Bernard, Appellees.
 Nos. 84-2143, 85-1128.
 United States Court of Appeals, Fourth Circuit.
 Argued June 4, 1986.
Decided Nov. 6, 1986.
 
 Before RUSSELL, WIDENER and WILKINSON, Circuit Judges.
 Joseph E. Blackburn, Jr. (White, Blackburn & Conte, P.C., on brief), for appellants.
 S. Keith Barker (Conrad B. Mattox, Jr., on brief), for appellees.
 PER CURIAM:
 
 
 1
 These are consolidated section 1983 actions by two municipal employees to recover damages against their employer and certain officials thereof for a disciplinary suspension of three days without pay for an alleged exercise by the plaintiffs of their free speech rights.[1] The plaintiffs in the actions are a police officer (Heislup) and a police dispatcher (Dixon) in the Police Department of the Town of Colonial Beach, a small Virginia municipality with a population of about 2500 persons. It is their contention that Heislup "was a witness to an unlawful beating of a juvenile" by another police officer (Sergeant Perry) in the Department, that Dixon heard Perry give "incriminating statements" in connection with such beating, and that, as a direct consequence of their public statement of what they had seen or heard, they were disciplined by the Town Council by being suspended "for a period of three days without pay for violation of not having properly conformed to the police code of ethics in the Town of Colonial Beach." The defendants are the Town of Colonial Beach, the members of the Town Council who voted in favor of the suspension, (Rogers, Fenwick, Denson, and Sydnor), the City Manager (Dunn), the Chief of Police (Anderson), Perry, (the Sergeant of the Police force) and a private attorney (Barnard).
 
 
 2
 After a measure of discovery, the cause proceeded to trial. At the conclusion of the evidence, all the defendants moved jointly for a directed verdict. The basis of the motion was that the plaintiffs had not established as a matter of law a violation of theirconstitutionally protected rights of free speech. The trial judge denied the motion. In addition, the defendants Dunn, Anderson, and Barnard filed individual motions for a directed verdict in favor of each on the ground that there was no evidence of their involvement in the allegedly unconstitutional action. The motion of the defendant Dunn was not opposed by the plaintiffs and that motion was granted. The individual motions of the defendants Anderson and Barnard were denied. The cause was thereupon submitted to a jury against all the defendants other than the defendant Dunn. From a judgment entered upon a favorable verdict for the plaintiffs, the defendants have appealed. We reverse, finding that there was no violation of anyconstitutionally protected right of the plaintiffs as a matter of law by the defendants. Since such ruling disposes of the case, we do not consider the other grounds of appeal raised by the defendants, including particularly their right to a new trial for improper jury argument of counsel and for error in admission of evidence.
 
 
 3
 * An understanding of the issues in the controversy requires a summary of events leading up to the actual circumstances of plaintiffs' suspension, which is the core of plaintiffs' claims. These events began on Sunday evening, May 31, 1981, on the boardwalk in the Town of Colonial Beach with some fighting between a group of white youths and a group of black youths. The leading participants in the encounter seem to have been a youth Winfield, among the whites and a youth Peyton among the blacks. Winfield, said to be a minor of 15 years, had admittedly been drinking and had been involved in earlier fighting on the boardwalk with Peyton on that evening. It was of interest that, under the testimony, Winfield had assaulted a police officer and had beaten his mother only a week earlier. So far as the record shows, Peyton was not drinking at the time and there is no suggestion that he had any prior record of disorderly conduct.
 
 
 4
 As a result of the disorder created on the boardwalk, the police department was called and Sergeant Perry and Officer Heislup responded separately to the call. Sergeant Perry arrived at the boardwalk first and encountered Winfield. The latter told Perry that the blacks had "beaten him up," hit him on the head and thrown rocks at him. He was, according to Perry, unquestionably in an angry mood, anxious to renew the fight. Perry sought to dissuade Winfield from any further fighting. Winfield responded that he wanted to "find" the guy who had beaten him, indicating an intention to continue the confrontation. As Perry was attempting to reason with him, Winfield turned and began walking away from Perry toward the group of blacks, among which was Peyton. Other youths joined Winfield and Peyton. Those joining Winfield were white, Peyton's group was black. Taunts were being exchanged between the two groups. In the meantime Heislup had arrived and was attempting to hold back the black youths. Up to this point, Perry's testimony is undisputed in the record. There is some discrepancy in the testimony of Perry and Heislup thereafter. Heislup said that at this time "someone in the crowd hollered to the Winfield boy. He turned to look, and as he did, Sergeant Perry put his left arm up on the boy's shoulders and struck him in the head with his night stick, knocking him to the ground." Perry's testimony, on the other hand, was that Winfield shouted an obscenity at the black youths. At that moment he "didn't know what was going to happen [in the black-white confrontation]. So when Winfield reached up at me, I hit him, hit him just like that quick, and immediately turned around to the blacks and told them to break it up and disperse. And they did." Too there is in the record a newspaper account published on July 9, 1981, which purports to give a summarized account of the incident as given the reporter by the participant Peyton: Winfield "emerged from the back of The Gameroom, and began walking towards him (meaning Peyton), saying 'I want to fight you.' Then, said Peyton, the officer struck the youth...."
 
 
 5
 It seems to have been agreed both by the plaintiffs and the defendants that police officers or employees who had participated in or had knowledge of any wrongdoing on the part of any other policeman while on duty were required to make a prompt report of what they had seen or of what they had reliably heard. Both plaintiffs recognized their responsibility under this Rule to report their accounts of the incident on May 31 and both claimed they had complied with this obligation in their complaints. Thus in his complaint the plaintiff Heislup alleged that "pursuant to the rules and regulations of the Town Police Department [he] informed members in the chain of command of the police department who were responsible for disciplining of [sic] Perry for the unlawful beating, of the May 30 [sic] 1981 events...." (Italics added). Similarly, the plaintiff Dixon alleged in her complaint that she, "pursuant to the rules and regulations of the Town Police Department, informed members in the chain of command of the Town Police Department who were responsible for disciplining Perry of [sic] the incriminating statements made by Perry concerning the unlawful beating...." (Italics added). It is established by the record that the "chain of command" in the Department led to the Chief of Police, the defendant Anderson. It is, however, equally established that neither the plaintiff Heislup nor the plaintiff Dixon had under-taken voluntarily to inform affirmatively "members in the chain of command of the Town Police Department" either of their observations or of what they may have heard about any "unlawful beating" administered by Sergeant Perry on the boardwalk on May 31, 1981.[2] Heislup did give to the Chief of Police the day after the incident and later did give to an officer of the Department who was officially investigating the incident his version of Sergeant Perry's conduct as we later point out, but in both instances only after he had been specifically requested for his account of the incident. The plaintiff Dixon, however, never gave any information of an alleged "unlawful beating" which she had heard through the "chain of command" in the Police Department.
 
 
 6
 Actually Heislup gave three separate accounts of the events on the boardwalk. The first occasion on which he gave an account of the incident was when he was interviewed by Chief Anderson on the morning after the incident. Chief Anderson requested from Heislup at that time his version of the event in which Sergeant Perry had been involved. Chief Anderson's request was simply one by a superior for information from an officer who was present on duty when the incident under review occurred, anentirely proper request. Heislup testified to no attempt whatsoever at the time, either expressed or implied, by Chief Anderson to influence Heislup's account of the event. Heislup's response to this inquiry from his superior officer was that he was "with Perry 100 per cent."[3] Unquestionably, Heislup intended by this answer to tell Chief Anderson that his version of the affair on the boardwalk was the same as that of Perry, and it was so understood by Chief Anderson. Admittedly, he made no reference to any "unlawful beating" but, on the contrary, put himself foursqauare alongside Sergeant Perry in the latter's account of the incident. After this statement by Heislup to Anderson, the latter said to Heislup, according to Heislup, "keep your goddamned mouth shut." Anderson denied making such a statement. This statement, if made at all, was admittedly made after Heislup had given his version of the incident to Chief Anderson and could have had no influence on the account Heislup gave of the incident.
 
 
 7
 A few days later in the same week as the incident, Heislup was interviewed by Lieutenant Graham, who had been assigned the task of investigating the incident on the boardwalk on May 31 on behalf of the Police Department. Heislup admitted he was told and understood the purpose of Graham's investigation and inquiry. Lieutenant Graham's account of Heislup's statement to him at that time, was that "he (Heislup) was trying to control some blacks in a separate little group there. He had his back to Mr. Winfield and Mr. Perry. He would turn around and check on Sergeant Perry ever so often. And that he said that everthing Sergeant Perry did, he acted properly." Heislup admitted having this interview. According to his version of the interview, he said that Lieutenant Graham "stated [to him] that he was investigating the incident, Winfield incident, that happened. I discussed it with him and also told Lieutenant Graham that I was with Perry 100 per cent." This, as can be seen, was essentially what Lieutenant Graham said that Heislup had told him.
 
 
 8
 Sometime after this but before Heislup gave an affidavit to DiRosario, to which we later refer, Perry and Heislup had a violent disagreement over an order given by Perry to Heislup. Both Perry and Heislup complained to Chief Anderson. The Chief concluded there was fault on both sides in the quarrel and dismissed both complaints.
 
 
 9
 On July 12, more than six weeks after the incident on the boardwalk, DiRosario saw Heislup. DiRosario was at the time a member of the City Council who was planning to run for Mayor and was a member of the Police Committee of the Council. There is some difference between DiRosario's and Heislup's statements as to the circumstances leading to Heislup agreeing at the time to give DiRosario a statement with reference to the event. Heislup suggested in his testimony that DiRosario persistently pressed Heislup to give him (DiRosario) a statement of the event, but that, remembering what Chief Anderson had told him, he at first refused. Later, after prayer, however, he decided to give DiRosario an affidavit regarding the incident. DiRosario's testimony suggests, on the other hand, that he did not pressure Heislup to provide a statement. In any event Heislup did give DiRosario an account of the incident quite different from that he had given Chief Anderson, Lieutenant Graham and Mrs. Borchevsky. In the statement, in affidavit form, which Heislup gave DiRosario, he said:
 
 
 10
 I did not make a statement at the time of the incident due to the fact that Chief Anderson told me not to talk to anyone about the fight, therefore, I wasn't asked to make a statement or a report.
 
 
 11
 I do not like to go against another police officer, but I feel that to maintain my own integrity this statement is being made.
 
 
 12
 ... I saw a large crowd of people standing around behind the Game Room, and saw Sgt. Perry and James Winfield in the lot next to the Game Room. James Winfield was backing away from Sgt. Perry and had his hands over his head. He had nothing in his hands. I heard alot of loud talking and saw eight (8) or nine (9) black males walking down Taylor Street. James Winfield was still backing away from Sgt. Perry until he was backed into the rear of a vehicle parked on Taylor Street. The blacks were at the front of the parked vehicle and I got between the blacks, Sgt. Perry and James Winfield. One of the blacks, Tony Peyton, hollored [sic] to James, "come on and fight me you white mother fucker." At that time James turned to face Tony and without provocation, Sgt. Perry put his arm up by James' shoulder and hit him in the head with the night stick.
 
 
 13
 Two days after Heislup had executed this affidavit, the plaintiff Dixon executed her affidavit at the request of DiRosario. She began her affidavit with the statement that Ms. Borchevsky, who was a fellow dispatcher and an assistant to the chief, had told her "if Todd Shields calls you don't know anything, you do not make any statements." Because of that statement, she had not made any statement until DiRosario "requested [her] to." She proceeded in her affidavit to state that, while she was being transported to work about midnight of May 31, 1981, by Sergeant Perry and Charity, she, seated on the back seat, heard Perry tell Charity "I hit him" (Winfield), "I don't know why," "I had no reason." When, however, Ms. Dixon testified before the Council panel hearing her suspension appeal at which she was represented by counsel, she felt that she "may have been mistaken in what I heard," adding, "and I didn't know the voice so I'm not charging him with anything. I'm only making a statement." Further, she answered the question whether DiRosario asked her "could he release [her affidavit] to the newspapers" with the words, "[h]e may have."
 
 
 14
 DiRosario testified that both Heislup and Dixon authorized him to give copies of their affidavits to the press. Neither Heislup nor Dixon dispute this testimony of DiRosario. DiRosario also distributed copies of the affidavits to all the members of the Council, to the Town Manager, the Town attorney, the Commonwealth attorney, Chief Anderson, the Clerk of the Juvenile Court and Winfield's attorney.
 
 
 15
 When it developed that Heislup and Dixon had given affidavits which contradicted--in effect repudiated--what Heislup had earlier told the Chief, Lieutenant Graham and Mrs. Borchevsky, and when those contradicting affidavits were published in the local press, a special meeting of the Town Council was held on July 22, 1981, at which time the Council voted a three-day suspension without pay of both Heislup and Dixon for violating the Code of Ethics and Rules of Conduct for the Town Police Department.[4] Heislup and Dixon, however, requested a hearing and an opportunity to contest the suspension in conformity with Sec. 15.1-814 of the Virginia Code. That request was granted, the suspension was stayed, and a hearing, at which Heislup and Dixon appeared, represented by counsel, was held in September, 1981. On October 8, 1981, the Town Council affirmed the suspension "for violation of not having properly conformed to the police code of ethics in the Town of Colonial Beach."[5]
 
 
 16
 The plaintiffs thereafter filed their actions charging that their suspension was a violation of their right of free speech protected under the First Amendment and redressable under 42 U.S.C. Sec. 1983.
 
 II
 
 17
 It is important at this stage to state what is the dispositive issue in this case and what is not. Whether Sergeant Perry properly or improperly hit Winfield on the night of May 31, 1981 is not critical to the decision of this case, nor are the plaintiffs proper parties to seek redress on account of any action of Sergeant Perry directed at Winfield. It does not concern us here whether Sergeant Perry on the occasion acted improperly and intemperately or whether he acted properly and justifiably in a reasonable effort to avoid a serious racial encounter. What is in issue here is whether the plaintiffs Heislup and Dixon suffered a violation of a constitutionally protected right under the free speech clause of the First Amendment as a result of their suspension by the Town Council for three days without pay. To resolve this, it is necessary to ascertain the circumstances under which it can be said that a public employee such as the plaintiffs may be said to have a valid action under section 1983 to recover for a violation of his or her constitutionally protected free speech rights.
 
 III
 
 18
 In the cases of Pickering v. Board of Education, 391 U.S. 563 (1968), and Connick v. Myers, 461 U.S. 138 (1983), the Supreme Court has set forth the test under which a public employee's speech may qualify for constitutional protection, a test under the decisions that is different from that applicable to a private employee since "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." 391 U.S. at 568. Under this test, the public employee's right of free speech must be balanced against the government's interests in the efficiency of its operations.[6] This test "consists of two parts, one part of which is directed at the question whether the employee's speech or activity qualifies 'as a matter of public concern' and the other focuses upon the effect of such speech or activity on the efficiency, discipline and proper administration of the agency." Jurgensen v. Fairfax County, 745 F.2d 868, 879 (4th Cir.1984). In short, it is not sufficient to qualify for constitutional protection that the speech in question related to a matter of public, as distinguished from private or personal, concern; the fact that the speech relates to a matter of public concern must be balanced against the government's interests in the efficiency of its own operations, and only if those government interests are overborne may constitutional protection be accorded the speech. See Connick, 461 U.S. at 150-51.
 
 
 19
 While the Supreme Court has not attempted to formulate a complete identification of the governmental interests that may properly be considered in applying this test, it did in Pickering and in Connick suggest a number of factors which should be considered. According to one commentator these factors are the need to maintain discipline, to preserve harmony among co-workers, to maintain personal loyalty and confidence, to avoid the general impairment of governmental operation, and to rebut without undue difficulty the false statements of its employees. See Note, The Nonpartisan Freedom of Expression of Public Employees, 76 Mich.L.Rev. 365, 368 (1977). We stated these factors as they applied specifically to a law enforcement officer in Cooper v. Johnson, 590 F.2d 559, 561 (4th Cir.1979) to be
 
 
 20
 whether [the officer's] speech ... [was] directed toward any person with whom he would normally be in contact in the course of his daily work; whether the speech might threaten either discipline by immediate supervisors or harmony among co-workers; whether [the officer's] relationship with the target of his speech was a working relationship for which personal loyalty and confidence were necessary; whether [the officer's] speech would tend to damage the professional reputation of its targets or foment controversy and conflict among his co-workers; whether [the officer's] speech reflected a difference of opinion on an issue of general public concern on which free and open debate is vital to informed decision-making by the electorate; and whether [the officer's] employment was substantially or only tangentially involved in the subject matter of his speech--in all, the issue is whether he spoke out as an employee or as a member of the public.
 
 
 21
 This statement of the factors to be considered, particularly in the case of law enforcement officers whose First Amendment rights are more strictly limited, follows the rule stated in McMullen v. Carson, 754 F.2d 936, 938 (11th Cir.1985), in which the Court said: "the second critical factor here is that plaintiff was employed by a law enforcement agency, the members of which are subject to greater First Amendment restraints than most other citizens." Other cases which have followed these heightened requirements for First Amendment rights for police officers are collected in Egger v. Phillips, 710 F.2d 292, 319 (7th Cir.) cert. denied, 464 U.S. 918 (1983).
 
 
 22
 Connick declares, also, that it is not necessary for the public employer "to prove that morale and efficiency in the agency have actually been adversely affected by the publication; it is sufficient that such damage to morale and efficiency is reasonably to be apprehended." See Jurgensen, supra, at 879. Further, whether the test for protected speech under Pickering and Connick is satisfied is a question of law for the court and not for a jury to decide. Lewis v. Blackburn, 734 F.2d 1000, 1009 n. 1 (4th Cir.1984) (dissenting opinion of Ervin, J., adopted en banc in 759 F.2d 1171 (4th Cir.) (citing Connick, 461 U.S. at 149 n. 7), cert. denied, --- U.S. ----, 106 S.Ct. 228 (1985); Loya v. Desert Sands United School District, 721 F.2d 279, 281 (9th Cir.1983); Bickel v. Burkhart, 632 F.2d 1251, 1256 (5th Cir.1980) ("Application of the Pickering balancing test is a question of law, ..."); Giles v. Alley, 591 F.Supp. 181, 187-88 (M.D.Ala.1984); Kelley v. City of Reno, 587 F.Supp. 21, 22 (D.Nev.1984); Note, Connick v. Myers: New Restrictions on the Free Speech Rights of Government Employees, 60 Ind.L.J. 339, 359, n. 142 (1985) ("The Connick Court reiterated its position that the inquiry into the protected status of speech is one of law, not fact. Connick, 461 U.S. at 148 n. 7. Thus appellate courts are in the same position as trial courts in resolving this issue. See Pennekamp v. Florida, 328 U.S. 331, 335 (1946).") It follows that it is for us to determine on this appeal as the first issue in the case whether in this case the plaintiffs had a constitutionally protected right which was violated by their suspensions.
 
 
 23
 It may be assumed, without carefully examining the question, that the statements which Heislup and Dixon gave DiRosario six weeks after the event as well as those given by Heislup earlier, in particular, related to matters of public concern. Further it would appear that these statements were involved in the determination by the Town Council to suspend the plaintiffs. But these statements may not be considered in isolation. All the statements by Heislup, for instance, were but a part of the record of statements made by this plaintiff in connection with the investigation of the circumstances on the boardwalk on May 31. Were the statement of July 12, 1982 by Heislup the sole record of his statements in this context and were there no reason to question the truthfulness of that statement, the claim of that plaintiff might be on firmer ground. But that is not the record in this case. Similarly, we have to compare the plaintiff Dixon's statement with her testimony before the panel of the Town Council hearing her appeal of her suspension, with her contention in this case as to her statements of the conversation of Heislup which she said she overheard.
 
 
 24
 Turning first to the plaintiff Heislup's case, we are concerned with three, not just one, statements made by Heislup in connection with the boardwalk incident. Two of these were given to his superiors and the third to DiRosario some six weeks after the first two statements. The first was made on the day after the boardwalk incident to his superior, Chief Anderson. In it he completely backed up Sergeant Perry in his account of the incident. Three or four days later, he gave a statement to the same purport to Lieutenant Graham, who was officially investigating the incident. On both these occasions, Heislup was under an obligation to answer the inquiries of his superiors truthfully and accurately and his superiors had a right to assume that Heislup was speaking truthfully without any intent of deception. Heislup recognized this duty in the allegations of his complaint, to which we earlier referred. Yet six weeks later, without any notice to his superiors to whom he had previously given statements, he proceeded to give a statement in the form of an affidavit to DiRosario in which he contradicted his prior statements, a statement which he knew and agreed was to be given the news media for publication. In fact, incredibly he began this affidavit by affirming that he had given no prior statement relating to the boardwalk incident to anyone even though he knew that he had earlier given statements to Chief Anderson and Lieutenant Graham about the incident. He proceeded from this falsification to declare in effect that the statements he had given Chief Anderson and Lieutenant Graham were false. And he did this knowing that Chief Anderson, in stating the Department's position on the incident, had assumed that the action of Sergeant Perry was proper, just as the plaintiff Heislup had affirmed to him. It is significant, too, that he repudiated his earlier statements to Chief Anderson and Lieutenant Graham with the knowledge that his repudiation was to be given to the news media without advising Chief Anderson that he had done so.
 
 
 25
 Both the plaintiff Heislup and his attorney recognized that Heislup's affidavit, as given to DiRosario, flatly contradicted his earlier statements to Chief Anderson and Lieutenant Graham. In response to an inquiry by his own counsel, he sought to excuse or justify what he later asserted were his prevarications.[7] In so doing, he gave two excuses for his action. First, he testified that he thought that, by allegedly stating falsely the circumstances of the incident and allying himself completely with Sergeant Perry's account, in the statement he made to Chief Anderson, he might "get a promotion out of it, to be in the silence thing, just to be in the clique." We shall not comment on this justification for falsifying an official report by a police officer to his superior; the mere statement of the reason carries its own condemnation. The second reason was that he knew there was a "cover-up" involved and it would "make it look better on me by going in with a cover-up." It is a shocking statement for a police officer to assert that he voluntarily agreed to participate in a "cover-up" of wrongdoing by a fellow officer. In fact, however, he offered no credible evidence justifying any charge of a "cover-up" in this instance; any charge of a "cover-up" was simply a fantasy apparently created by Heislup to provide a semblance of justification for his change in his statement of the incident. He cited no statement or action by either Chief Anderson or Lieutenant Graham to indicate that either was engaged in a "cover-up." There was no attempt by either the Chief or the Lieutenant to coerce him or even to influence him in any way in the statements he gave them. His statements were by his own account entirely voluntary and, if false and untruthful, they were so because he said that he sought to curry favor and to secure a promotion by what, by his contention at trial, was nothing more or less than an inexcusable attempt at deception.
 
 
 26
 Heislup did try to give some semblance of warrant for his charge of "cover-up" by citing an earlier instance in which he said he had passed on to Chief Anderson a statement by a third person that Sergeant Perry had been seen with paraphernalia with which to smoke "dope." He testified the charge was never investigated. The Chief concluded that a charge against a member of his force could better be investigated by the State Police. The record shows that he requested, by letter, the Chief of the State Police to conduct with his personnel such an investigation. The letter, of course, did not identify Sergeant Perry as the object of the investigation but since this complaint against Sergeant Perry was the only one under investigation the letter to the Chief of the State Police manifestly referred to the complaint against Sergeant Perry. The State Police refused to investigate the complaint since it charged only a misdemeanor against which the statute of limitations had run. The State Police investigator recommended that the Chief himself investigate the charge. The Chief followed this advice. He interviewed, according to his undisputed testimony, the person who was the source of the charge. After these interviews the Chief concluded that the charge was ill-founded. The plaintiff does not take issue with the Chief's conclusion that the charge was meritless.
 
 
 27
 It follows that there was no basis whatsoever for any conclusion that the Department intended a "cover-up." And the trial judge, who had heard all the testimony, stated that there was no evidence of a "cover-up" in connection with the boardwalk incident. Whatever the reason for Heislup's repudiation of his earlier versions of the boardwalk affair, neither of the reasons he gave for his repudiation had any substance.
 
 
 28
 The Town Council was thus faced with a clear case of a police officer whose report of an incident involving another officer while engaged in his official duties as given to his superiors, was later declared by that same officer to be false. It was confronted with a case where that officer had made the false statements, as he admitted, either to enhance his chances for promotion or as a part of what he said was a "cover-up."[8] His action in so reporting to his superiors what he later said was, if true, a plain instance of ins b rdination on his part and infidelity to his duty as a law enforcement officer. Unquestionably, it was to be apprehended that this published repudiation of his earlier statements of an incident that had aroused interest in the community would embarrass and weaken the Department in the confidence and esteem of the public. Moreover, to have a police officer actually proclaim that he had been guilty of falsifying a matter which he was called upon under the Police Rules to report accurately and truthfully is conduct which, if countenanced, would reflect discredit on the integrity of such officer and on the Police Department. It may be reasonably apprehended that the example set by such conduct, if condoned, would prejudically affect also the discipline of the Department, would encourage insubordination and disregard of the obligations owed by police officers in the Department to be truthful and accurate in reports to his or her superiors, and in their reports to the public, and would undermine the regard of the community for the trustworthiness, truthfulness and reliability of the Department and its officers. If anything, the action of the Town Council could be faulted, not for its action in suspending Heislup for three days without pay, but for the leniency of its discipline. We accordingly have no difficulty in concluding that the evidence fails to establish a violation of the plaintiff Heislup's constitutionally protected right of free speech and therefore remand the cause for the entry of judgment in his case in favor of all defendants.
 
 
 29
 The case of Ms. Dixon is more difficult than that of her co-plaintiff Heislup. She gave no statement about the matter involved here until she executed an affidavit at the instance of DiRosario a day or two after Heislup had given DiRosario an affidavit. The problem with her case, though, is that, when she appeared before the Council in opposing a suspension, she testified that she was uncertain whether Sergeant Perry had made the statements attributed to him in her sworn statement given to DiRosario. An official in a police department, whether an officer or a dispatcher, should not give statements to the press charging that an officer of the Department had confessed to wrongdoing and then, when called to justify her statements, profess an inability to confirm what she had included in her earlier affidavit. It is essential to discipline in a police department that officials in the department always answer in a responsible manner. Unless the Colonial Beach Department maintains that reputation for its employees, the integrity of the Department in the public mind will be doubted and its efficiency diminished. Though her case is not as clear as that of Heislup, we find that the plaintiff Dixon is also not entitled to recover under the standards established in Pickering and Connick and that the motion of the defendants for judgment in their favor should have been granted.
 
 
 30
 The judgments herein in favor of the plaintiffs are accordingly vacated and the causes are remanded to the district court with instructions to enter judgment in favor of the defendants.*
 
 
 31
 REVERSED AND REMANDED WITH INSTRUCTIONS.
 
 
 
 [1]
 Because of their similarity factually and legally the two actions were consolidated by consent
 
 
 [2]
 Sergeant Perry, either the night of the incident or early the next morning, before the Chief saw the plaintiff Heislup, reported to Chief Anderson his version of the incident
 
 
 [3]
 Ms. Borchevsky, a longtime employee in the department, testified that she came in while the Chief was discussing the incident with Officer Heislup. She said she apologized for interrupting them. Officer Heislup replied that she was not "interrupting anything," that he was "just telling the Chief what happened over the weekend, that [he] backed up Officer Perry wholeheartedly." This conversation was not contradicted by Heislup
 
 
 [4]
 The Town Police Department had certain Rules of Conduct for all employees of the Department. Among such Rules was the following:
 A member of the Colonial Beach Police Department shall not furnish material or write anything concerning police matters for publication or broadcast without approval of the Chief of Police or except when otherwise predetermined by the Chief of Police.
 In addition, the Rules of Conduct included these provisions:
 
 
 [1]
 A member of the Colonial Beach Police Department will be held responsible for any act or omission specifically required or prohibited in these and/or any other applicable Rules or Regulations which in any way is prejudicial to good order or discipline, or reflects upon the good name or reputation of the Colonial Beach Police Department, or adversely affects its interest
 
 
 [2]
 A member of the Colonial Beach Police Department is charged with the duty to conduct himself at all times in keeping with the Code of Ethics, and the policy statements of the Chief of Police; all activities contrary to this concept, whether or not specifically mentioned or prohibited in these Rules, may subject a member of the Colonial Beach Police Department to disciplinary action
 
 
 [3]
 A member of the Colonial Beach Police Department will promptly obey all lawful and proper orders and instructions issued by a superior officer or a recognized higher authority, however transmitted or received. Lawful and proper orders and instructions are those which conform to the policies and orders set forth or provided for by the Colonial Beach Police Department
 
 
 [5]
 The plaintiffs did not appeal judicially for a de novo trial of their suspension as the Virginia statute expressly authorizes. Va.Code Sec. 15.1-814
 
 
 [6]
 The Court said in Pickering, 391 U.S. at 568:
 The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.
 In Connick, the Court said, 461 U.S. at 150-51):
 The Pickering balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public....
 "To this end, the Government, as employer, must have wide discretion and control over the management of its personnel and internal affairs."
 (Quoting from Powell, J., in his separate opinion in Arnett v. Kennedy, 416 U.S. 134, 168 (1974)).
 
 
 [7]
 The exchange between the plaintiff Heislup and his counsel was as follows:
 Q. Now, Officer Heislup, you said that you told the Chief that you would be with Sergeant Perry 100 per cent. Why?
 A. Well, I figured that I would get in with him and make it look better on me by going in with a cover-up. Of course, they knew that I knew something was wrong. And I may get a promotion out of it, to be in the silence thing, just to be in the clique.
 
 
 [8]
 It could well be argued that this case presents the question noted but reserved for decision in Pickering's note 6. 391 U.S. at 574. As the Court in that case expressed its holding:
 In sum, we hold that, in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment. 391 U.S. at 574.
 If we are to believe Heislup's affidavit, his statements to Chief Anderson and to Lieutenant Graham were false and knowingly false. So far as Heislup's own contention at trial is concerned, he declared his earlier testimony was known by him at the time to be false and he assigned two excuses for his resort to deception. Neither excuse constituted a justification for his earlier alleged prevarication. This could bring this case within the situation reserved for decision in Pickering. We prefer, however, not to address the question reserved in Pickering and to decide the case on more orthodox grounds.
 
 
 *
 In view of our disposition of the substantive issues herein, it is unnecessary for us to consider the plaintiffs' application for allowance of attorneys' fees